998 So.2d 1102 (2008)
WALTON COUNTY, et al., Petitioners,
v.
STOP the BEACH RENOURISHMENT, INC., et al., Respondents.
Florida Department of Environmental Protection, etc., Petitioner,
v.
Stop the Beach Renourishment, Inc., et al., Respondents.
Nos. SC06-1447, SC06-1449.
Supreme Court of Florida.
September 29, 2008.
Rehearing Denied December 18, 2008.
*1104 Thomas G. Pelham, Special Counsel, Tallahassee, Florida, Hala A. Sandridge of Fowler, White, Boggs, and Banker, P.A., Tampa, Florida, and Kenneth J. Plante, Wilbur E. Brewton, Kelly B. Plante, and Tana D. Storey of Roetzel and Andress, L.P.A., Tallahassee, Florida; Scott Makar, Solicitor General, Tallahassee, Florida; Thomas M. Beason, General Counsel, Teresa L. Mussetto and L. Kathryn Funchess, Senior Assistant General Counsels, Department of Environmental Proctection, Tallahassee, Florida, for Petitioners.
Dan R. Stengle, Richard S. Brightman, and D. Kent Safriet of Hopping, Green, and Sams, P.A., Tallahassee, Florida, for Respondent.
Linda Loomis Shelley of Fowler, White, Boggs, and Banker, P.A., Tallahassee, Florida, on behalf of Florida Shore and Beach Preservation Association; Kenneth J. Plante, Wilbur E. Brewton, Kelly B. Plante, and Tana D. Storey of Roetzel and Andress, LPA, Tallahassee, Florida, on behalf of Florida Association of Convention and Visitors Bureau, Inc.; Gary K. Oldehoff and David M. Pearce on behalf of Florida Association of Counties and Florida League of Cities; Victoria L. Weber of Hopping, Green and Sams, P.A., Tallahassee, Florida, and Keith Hetrick, General Counsel, Florida Home Builders Association, Tallahassee, Florida, on behalf of Florida Home Builders Association; Steven Geoffrey Gieseler and Valerie A. Fernandez, Coral Gables, Florida, on behalf of Pacific Legal Founation, As Amici Curiae.
*1105 BELL, J.
We have for review the First District Court of Appeal's decision in Save Our Beaches, Inc. v. Florida Department of Environmental Protection, 31 Fla. L. Weekly D1173, ___ So.2d ____, 2006 WL 1112700 (Fla. 1st DCA Apr.28, 2006). In its decision, the First District certified the following question to be of great public importance:
Has Part I of Chapter 161, Florida Statutes (2005), referred to as the Beach and Shore Preservation Act, been unconstitutionally applied so as to deprive the members of Stop the Beach Renourishment, Inc. of their riparian rights without just compensation for the property taken, so that the exception provided in Florida Administrative Code Rule 18-21.004(3), exempting satisfactory evidence of sufficient upland interest if the activities do not unreasonably infringe on riparian rights, does not apply?
Id. We have both mandatory and discretionary jurisdiction. See art. V, § 3(b)(1), § 3(b)(4), Fla. Const.
Though it phrased its certified question in terms of an applied challenge, the First District actually addressed a facial challenge.[1] Therefore, we rephrase the certified question as follows:
On its face, does the Beach and Shore Preservation Act[2] unconstitutionally deprive upland owners of littoral[3] rights without just compensation?
We answer the rephrased certified question in the negative and quash the decision of the First District. As explained below, we find that, on its face, the Beach and Shore Preservation Act does not unconstitutionally deprive upland owners of littoral rights without just compensation. At the outset, however, we emphasize that our decision in this case is strictly limited to the context of restoring critically eroded beaches under the Beach and Shore Preservation Act.

I. THE CONTEXT

A. Factual and Procedural History
As the First District explained in its opinion,

*1106 [t]he Gulf of Mexico beaches of the City of Destin and Walton County were [damaged] by Hurricane Opal in 1995.[[4]] The ... problem was identified by the Department [of Environmental Protection (Department)], which placed these beaches on its list of critically-eroded beaches. Destin and Walton County then initiated a lengthy process of beach restoration through renourishment. The process, which included extensive studies and construction design and pre-application conferences with Department staff, culminated in the filing of an Application for a Joint Coastal Permit and Authorization to Use Sovereign Submerged Lands on July 30, 2003.
The application proposed to dredge sand from an ebb shoal borrow area south of East Pass in eastern Okaloosa County, using either a cutter head dredge (which disturbs the sand on the bottom of the borrow area and vacuums it into a pipeline which delivers it to the project area) or a hopper dredge (which fills itself and is moved to the project site). On the project site, heavy equipment moves the dredged sand as specified in the design plans. The project is executed in this manner and progresses along the beach, usually at a pace of about 300 to 500 feet a day.
Save Our Beaches, 31 Fla. L. Weekly at D1173, ___ So.2d at ____.
To determine the mean high water line (MHWL) for the restoration area, a coastline survey was completed in September 2003. The Board of Directors for the Internal Improvement Trust Fund (Board) subsequently established an erosion control line (ECL) at the surveyed MHWL. Pursuant to section 161.191(1) of the Beach and Shore Preservation Act, this ECL became the boundary between publicly owned land and privately owned upland after it was recorded. Then, on July 15, 2004, the Department issued a Notice of Intent to Issue the permit.
Stop the Beach Renourishment (STBR)[5] timely filed two petitions for formal administrative hearings, the first challenging the issuance of the permit and the second raising constitutional issues. A formal administrative hearing was held on STBR's permit challenge while its constitutional challenge was deferred for determination in court proceedings. See Save Our Beaches, 31 Fla. L Weekly at D1174-75, ___ So.2d at ____.[6]
On June 30, 2005, following the administrative hearing, the administrative law judge recommended that the Department enter a final order issuing the permit. The Department entered its final order on July 27, 2005, determining that the permit *1107 was properly issued pursuant to existing statutes and rules.
Before the First District, STBR challenged the Department's final order, claiming in essence that the final order is unconstitutional because it was issued pursuant to an unconstitutional statute. Specifically, STBR asserted that section 161.191(1) of the Beach and Shore Preservation Act, which fixes the shoreline boundary after the ECL is recorded, unconstitutionally divests upland owners of all common law littoral rights by severing these rights from the uplands. According to STBR, after the recording of the ECL and by operation of section 161.191(1), the State becomes owner of the land to which common law littoral rights attach because it owns all lands seaward of the ECL. STBR further argued that the littoral rights, which are expressly preserved by section 161.201 of the Act, are an inadequate substitute for the upland owners' common law littoral rights that are eliminated by section 161.191.
The First District agreed the Act divests upland owners of their littoral right to receive accretions and relictions because section 161.191(2) provides that the common law rule of accretion and reliction no longer operates once the ECL is recorded. See Save Our Beaches, 31 Fla. L. Weekly at D1177, ___ So.2d at ____. The First District also agreed that the Act eliminates the right to maintain direct contact with the water since section 161.191(1) establishes the ECL as the shoreline boundary. See id. Furthermore, the First District found that:
Although section 161.201 has language describing a preservation of common law riparian rights, it does not actually operate to preserve the rights at issue . . . [because] Florida's law is clear that riparian rights cannot be severed from riparian uplands absent an agreement with the riparian owner, not even by the power of eminent domain.
Id. (citing Belvedere Dev. Corp. v. Dep't of Transp., 476 So.2d 649 (Fla.1985) as controlling). Thus, the First District held that the final order issued pursuant to the Act results in an unconstitutional taking of the littoral rights to accretion and to contact with water without an eminent domain proceeding as required by section 161.141, Florida Statutes. Id.
The First District remanded for the Department to provide satisfactory evidence of sufficient upland interest pursuant to Florida Administrative Code Rule 18-21.004(3). Id. Then, on July 3, 2006, the First District certified the question of great public importance described earlier. Id.

B. The Beach and Shore Preservation Act
Before addressing the rephrased certified question, it is helpful to provide the relevant portions of the Beach and Shore Preservation Act.
Recognizing the importance and volatility of Florida's beaches, the Legislature in 1961 enacted the Beach and Shore Preservation Act. Ch. 61-246, § 1, Laws of Fla. (codified at §§ 161.011-161.45, Fla. Stat. (2005)). Determining that "beach erosion is a serious menace to the economy and general welfare of the people of [Florida] and has advanced to emergency proportions," the Legislature declared it "a necessary governmental responsibility to properly manage and protect Florida beaches ... from erosion," and to provide funding for beach nourishment projects. § 161.088. The Legislature then delegated to the Department the authority to determine "those beaches which are critically eroded and in need of restoration and *1108 nourishment"[7] and to "authorize appropriations to pay up to 75 percent of the actual costs for restoring and renourishing a critically eroded beach." § 161.101(1).
Pursuant to section 161.141, when a local government applies for funding for beach restoration, a survey of the shoreline is conducted to determine the MHWL for the area. Once established, any additions to the upland property landward of the MHWL that result from the restoration project remain the property of the upland owner subject to all governmental regulations, including a public easement for traditional uses of the beach. § 161.141.
After the MHWL is established, section 161.161(3) provides that the Board must determine the area to be protected by the project and locate an ECL. In locating the ECL, the Board is "guided by the existing line of mean high water, bearing in mind the requirements of proper engineering in the beach restoration project, the extent to which erosion or avulsion has occurred, and the need to protect existing ownership of as much upland as is reasonably possible." § 161.161(5).
Pursuant to section 161.191(1), this ECL becomes the new fixed property boundary between public lands and upland property after the ECL is recorded.[8] And, under section 161.191(2), once the ECL has been established, the common law no longer operates "to increase or decrease the proportions of any upland property lying landward of such line, either by accretion or erosion or by any other natural or artificial process."
However, section 161.201 expressly preserves the upland owners' littoral rights, including, but not limited to, rights of ingress, egress, view, boating, bathing, and fishing, and prevents the State from erecting structures on the beach seaward of the ECL except as required to prevent erosion. Section 161.141 further declares that the State has no intention "to extend its claims to lands not already held by it or to deprive any upland or submerged land owner of the legitimate and constitutional use and enjoyment of his or her property."
Moreover, section 161.141 explains that "[i]f an authorized beach restoration, beach nourishment, and erosion control project cannot reasonably be accomplished without the taking of private property, the taking must be made by the requesting authority by eminent domain proceedings." And, in the event the beach restoration is not commenced within a two-year period, is halted *1109 in excess of a six-month period, or the authorities do not maintain the restored beach, section 161.211 dictates that the ECL is cancelled.

II. DISCUSSION
As stated earlier, the First District determined that section 161.191 of the Beach and Shore Preservation Act facially results in an unconstitutional taking of upland owners' littoral rights to receive accretions and to maintain direct contact with the water despite the express preservation of littoral rights in section 161.201. The determination of a statute's constitutionality and the interpretation of a constitutional provision are both questions of law reviewed de novo by this Court. See Zingale v. Powell, 885 So.2d 277, 280 (Fla. 2004). "While we review decisions striking state statutes de novo, we are obligated to accord legislative acts a presumption of constitutionality and to construe challenged legislation to effect a constitutional outcome whenever possible." Fla. Dep't of Revenue v. Howard, 916 So.2d 640, 642 (Fla.2005). Moreover, "a determination that a statute is facially unconstitutional means that no set of circumstances exists under which the statute would be valid." Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250, 256 (Fla.2005).
After reviewing Florida's common law as well as the Beach and Shore Preservation Act's effect upon that common law, we find that the Act, on its face, does not unconstitutionally deprive upland owners of littoral rights without just compensation. In explaining our conclusion, we first describe the relationship at common law between the public and upland owners in regard to Florida's beaches. We then detail the Beach and Shore Preservation Act's impact upon this relationship. In particular, we explore how the Act effectuates the State's constitutional duty to protect Florida's beaches in a way that facially balances public and private interests. Finally, we address the First District's decision.

A. The Relationship at Common Law between the Public and Upland Owners
Since the vast development of Florida's beaches, there has been a relative paucity of opinions from this Court that describe the nature of the relationship at common law between the public and upland owners in regard to Florida's beaches. It is important that we outline this relationship prior to resolving the specific issues in this case.

(1) The Public and Florida's Beaches
Under both the Florida Constitution and the common law, the State holds the lands seaward of the MHWL, including the beaches between the mean high and low water lines, in trust for the public for the purposes of bathing, fishing, and navigation. See art. X, § 11, Fla. Const. ("The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people."); White v. Hughes, 139 Fla. 54, 190 So. 446, 449 (1939) ("The State holds the fore-shore in trust for its people for the purposes of navigation, fishing and bathing."); see also Clement v. Watson, 63 Fla. 109, 58 So. 25, 26 (1912).
As we explained in Brickell v. Trammell, 77 Fla. 544, 82 So. 221 (1919), this public trust doctrine has its origins in English common law:
Under the common law of England the crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in *1110 trust for the people of the realm who had rights of navigation, commerce, fishing, bathing, and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies of America.
After the Revolution resulting in the independence of the American states, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the states in which they were located, in trust for all the people of the states respectively.
When the Constitution of the United States became operative, the several states continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of disposition to individual ownerships, but such title was held in trust for all the people of the state respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the states under the federal Constitution.
The rights of the people of the states in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low waters marks, relate to navigation, commerce, fishing, bathing, and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the states, and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guaranties of private property rights.
The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the states. For the purpose of enhancing the rights and interests of the whole people, the states may by appropriate means grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the states respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. See 62 Fla. 549, 57 So. 428; Clement v. Watson, 63 Fla. 109, 58 So. 25.
New states, including Florida, admitted "into the Union on equal footing with the original states, in all respects whatsoever," have the same rights, prerogatives, and duties with respect to the navigable waters and the lands thereunder within their borders as have the original 13 states of the American Union. Among these prerogatives are the right and duty of the states to own and hold the lands under navigable waters for the benefit of the people....
Id. at 226 (parallel citations omitted); see also Hayes v. Bowman, 91 So.2d 795, 799 (Fla.1957); State v. Gerbing, 56 Fla. 603, 47 So. 353, 355-56 (1908).
In addition to its duties under the public trust doctrine, the State has an obligation to conserve and protect Florida's beaches as important natural resources. As article II, section 7(a) of the Florida Constitution states,
[i]t shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise and for the conservation and protection of natural resources.
Concisely put, the State has a constitutional duty to protect Florida's beaches, part *1111 of which it holds "in trust for all the people." Art. X, § 11, Fla. Const.
Having explained the State's interests and duties on behalf of the public in relation to Florida's beaches, we now describe the upland owners' interests and rights.

(2) The Upland Owners and Florida's Beaches
Private upland owners hold the bathing, fishing, and navigation rights described above in common with the public. Brickell, 82 So. at 227; Broward v. Mabry, 58 Fla. 398, 50 So. 826, 830 (1909). In fact, upland owners have no rights in navigable waters and sovereignty lands that are superior to other members of the public in regard to bathing, fishing, and navigation. See Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n, 57 Fla. 399, 48 So. 643, 645 (1909). However, upland owners hold several special or exclusive common law littoral rights: (1) the right to have access to the water; (2) the right to reasonably use the water; (3) the right to accretion and reliction; and (4) the right to the unobstructed view of the water. Bd. of Trs. of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934, 936 (Fla.1987); Belvedere, 476 So.2d at 651; Brickell, 82 So. at 227; Broward, 50 So. at 830. These special littoral rights "are such as are necessary for the use and enjoyment" of the upland property, but "these rights may not be so exercised as to injure others in their lawful rights." Ferry Pass, 48 So. at 645.
Though subject to regulation, these littoral rights are private property rights that cannot be taken from upland owners without just compensation. Sand Key, 512 So.2d at 936; Brickell, 82 So. at 227; Broward, 50 So. at 830. Indeed, in Thiesen v. Gulf, Florida & Alabama Railway Co., 75 Fla. 28, 78 So. 491, 506-07 (1918), this Court considered and rejected the notion that littoral rights are subordinate to public rights and, as a result, could be eliminated without compensation. And, over the years, Florida courts have found unconstitutional takings when certain littoral rights were materially and substantially impaired. See Lee County v. Kiesel, 705 So.2d 1013 (Fla. 2d DCA 1998) (holding that upland owners were entitled to compensation because bridge substantially and materially obstructed their littoral right to view); Game & Fresh Water Fish Comm'n v. Lake Islands, Ltd., 407 So.2d 189 (Fla.1981) (holding that boating regulation was unconstitutional as to littoral owner because it substantially denied the right of access); see also Webb v. Giddens, 82 So.2d 743 (Fla.1955) (finding that culvert substantially impaired littoral owner's right of access); cf. Duval Eng'g & Contracting Co. v. Sales, 77 So.2d 431 (Fla. 1954) (holding that upland owners had no right to compensation when there was only a slight impairment of littoral rights and owners did not show a material disturbance of the littoral rights to access and view).
While Florida case law has clearly defined littoral rights as constitutionally protected private property rights, the exact nature of these rights rarely has been described in detail. See Webb, 82 So.2d at 745 (explaining that littoral rights "have been broadly and inexactly stated").[9] *1112 Early on, this Court described the nature of littoral rights as follows:
These special rights are easements incident to the [littoral] holdings and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law. The common-law [littoral] rights that arise by implication of law give no title to the land under navigable waters except such as may be lawfully acquired by accretion, reliction, and other similar rights.
Brickell, 82 So. at 227 (emphasis added); see also Broward, 50 So. at 830.
Based upon this early description, the littoral rights to access, use, and view are easements under Florida common law.[10] Generally speaking, "[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." Restatement (Third) of Property § 1.2(1) (2000). More specifically, the littoral rights to access and use are affirmative easements as they grant "rights to enter and use land in possession of another." Id. at § 1.2 cmt. a. In contrast, the littoral right to view is a negative easement as it "restrict[s] the uses that can be made of property." Id.
Furthermore, based upon this Court's early description of the nature of littoral rights, it is evident that the littoral right to accretion and reliction is distinct from the rights to access, use, and view. The rights to access, use, and view are rights relating to the present use of the foreshore and water. The same is not true of the right to accretion and reliction. The right to accretion and reliction is a contingent, future interest that only becomes a posessory interest if and when land is added to the upland by accretion or reliction. See Brickell, 82 So. at 227 ("[Littoral] rights ... give no title to the land under navigable waters except such as may be lawfully acquired by accretion, reliction, and other similar rights."); cf. Restatement of Property § 153 (1936) (defining the nature of future interests).
At this point, we have described the upland owners' littoral rights and the State's duties in regard to Florida's beaches. We next explain how the common law attempts to bring order and certainty to the physical location where these often competing interests intersect.

(3) Dealing with a Dynamic Boundary
The boundary between public or sovereignty lands and private uplands is a dynamic boundary, which is located on a shoreline that, by its very nature, frequently changes. Florida's common law attempts to bring order and certainty to this dynamic boundary in a manner that reasonably balances the affected parties' interests.
Before detailing the common law rules that are intended to balance public and private interests in the changing shoreline, *1113 it is helpful to review several common law definitions. "Erosion" is the gradual and imperceptible wearing away of land from the shore or bank. See generally Black's Law Dictionary (8th ed.2004). And, as we have explained,
"[a]ccretion" means the gradual and imperceptible accumulation of land along the shore or bank of a body of water. "Reliction" or "dereliction" is an increase of the land by a gradual and imperceptible withdrawal of any body of water. "Avulsion" is the sudden or perceptible loss of or addition to land by the action of the water or a sudden change in the bed of a lake or the course of a stream. "Gradual and imperceptible" means that, although witnesses may periodically perceive changes in the waterfront, they could not observe them occurring. See generally Black's Law Dictionary (5th ed.1979); F. Maloney, S. Plager & F. Baldwin, Water Law and Administration  The Florida Experience 385-92 (1968); 65 C.J.S.. Navigable Waters §§ 81, 86, 93 (1966).
Sand Key, 512 So.2d at 936. Moreover, "alluvion" describes the actual deposit of land that is added to the shore or bank. See Mark S. Dennison, Proof of Accretion or Avulsion in Title Boundary Disputes Over Additions to Riparian Land, 73 Am. Jur. Proof of Facts 3d 167, § 2, at 180 (2003).
The boundary between public lands and private uplands is the MHWL, which represents an average over a nineteen-year period. Kruse v. Grokap, Inc., 349 So.2d 788, 789-90 (Fla. 2d DCA 1977) (citing Borax Consolidated, Ltd. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935); Miller v. Bay-To-Gulf, Inc., 141 Fla. 452, 193 So. 425 (1940)); see also George M. Cole, Tidal Water Boundaries, 20 Stetson L.Rev. 165 (1990). As the Second District has explained, "[t]he variations which occur in major tide producing forces will go through one complete cycle in approximately 18.6 years. Apparently this figure is often rounded out to nineteen years." Kruse, 349 So.2d at 789-90 (citing Frank E. Maloney & Richard C. Ausness, The Use and Legal Significance of the Mean High Water Line in Coastal Boundary Mapping, 53 N.C. L.Rev. 185, 196 (1974)). This nineteen-year period for determining the MHWL is codified in section 177.27, Florida Statutes (2007), a provision of the Florida Coastal Mapping Act of 1974. See id. at 790 n. 8 (citing § 177.27(15), Fla. Stat. (1975)).
Under Florida common law, the legal effect of changes to the shoreline on the boundary between public lands and uplands varies depending upon whether the shoreline changes gradually and imperceptibly or whether it changes suddenly and perceptibly. Blackstone summarized this ancient distinction as follows:
And as to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make terra firma; or by dereliction, as when the sea shrinks back below the usual watermark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For de minimis non curat lex: and, besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss. But, if the alluvion or dereliction be sudden and considerable, in this case it belongs to the king: for, as the king is lord of the sea, and so owner of the soil while it is covered with water, it is but reasonable he should have the soil, when the water has left it dry.
*1114 William Blackstone, 2 Commentaries on the Laws of England, 261-62 (footnotes omitted). Or, as stated in more current language,
[t]he principal significance of the distinction between erosion[, reliction,] and accretion on the one hand, and avulsion on the other, is that the owner of the [upland] loses title to land that is lost by erosion and ordinarily becomes the owner of land that is added to his land by accretion [or reliction], whereas if an avulsion has occurred, the boundary line remains the same regardless of the change in the ... shoreline.
73 Am.Jur. Proof of Facts 3d 167, § 3, at 182; see also 1 Water and Water Rights § 6.03(b)(2), at 189 (Robert E. Beck ed., 1991); 78 Am.Jur.2d Waters § 315 (2002).
Accordingly, under the doctrines of erosion, reliction, and accretion, the boundary between public and private land is altered to reflect gradual and imperceptible losses or additions to the shoreline. See, e.g., Sand Key, 512 So.2d 934. In contrast, under the doctrine of avulsion, the boundary between public and private land remains the MHWL as it existed before the avulsive event led to sudden and perceptible losses or additions to the shoreline. See, e.g., Bryant v. Peppe, 238 So.2d 836, 838 (Fla.1970).
These common law doctrines reflect an attempt to balance the interests of the parties affected by inevitable changes in the shoreline. For instance, as the Second District explained in Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209, 212-13 (Fla. 2d DCA 1973), "[t]here are four reasons for the doctrine of accretion:"
(1) [D]e minimis non curat lex; (2) he who sustains the burden of losses and of repairs imposed by the contiguity of waters ought to receive whatever benefits they may bring by accretion; (3) it is in the interest of the community that all land have an owner and, for convenience, the riparian is the chosen one; (4) the necessity for preserving the riparian right of access to the water. See St. Clair County v. Lovingston, 90 U.S. (23 Wall.) 46, 67, 23 L.Ed. 59 (1874); Maloney, Plager and Baldwin, Water Law and Administration: The Florida Experience, 386 (1968).
Id. 212-13 (parallel citations omitted). These same reasons explain the doctrine of reliction. And, as for the rationale underlying the doctrine of avulsion, it has been argued that there is a need to mitigate the hardship of drastic shifts in title that would result if the doctrines of accretion, erosion, and reliction were applied to sudden and unexpected changes in the shoreline. See Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 327, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), overruled on other grounds by Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); Nebraska v. Iowa, 143 U.S. 359, 362, 12 S.Ct. 396, 36 L.Ed. 186 (1892); see also Strom v. Sheldon, 12 Wash.App. 66, 527 P.2d 1382, 1384 (1975).
While our common law has developed these specific rules that are intended to balance the interests in our ever-changing shoreline, Florida's common law has never fully addressed how public-sponsored beach restoration affects the interests of the public and the interests of the upland owners. We now turn to the legislative attempt to deal with this subject.

B. The Beach and Shore Preservation Act's Balancing of Public and Private Interests
As explained earlier, the State has a constitutional duty to protect Florida's beaches, part of which it holds in trust for *1115 public use. The Beach and Shore Preservation Act effectuates this constitutional duty when the State is faced with critically eroded, storm-damaged beaches.
Like the common law, the Act seeks a careful balance between the interests of the public and the interests of the private upland owners. By authorizing the addition of sand to sovereignty lands, the Act prevents further loss of public beaches, protects existing structures, and repairs prior damage. In doing so, the Act promotes the public's economic, ecological, recreational, and aesthetic interests in the shoreline. On the other hand, the Act benefits private upland owners by restoring beach already lost and by protecting their property from future storm damage and erosion. Moreover, the Act expressly preserves the upland owners' rights to access, use, and view, including the rights of ingress and egress. See § 161.201. The Act also protects the upland owners' rights to boating, bathing, and fishing. See id. Furthermore, the Act protects the upland owners' view by prohibiting the State from erecting structures on the new beach except those necessary to prevent erosion. See id. Thus, although the Act provides that the State may retain title to the newly created dry land directly adjacent to the water, upland owners may continue to access, use, and view the beach and water as they did prior to beach restoration. As a result, at least facially, there is no material or substantial impairment of these littoral rights under the Act. See Duval, 77 So.2d at 434 (finding no taking when there was no material or substantial impairment of littoral rights to access and view).
Finally, the Act provides for the cancellation of the ECL if (1) the beach restoration is not commenced within two years; (2) restoration is halted in excess of a six-month period; or (3) the authorities do not maintain the restored beach. See § 161.211. Therefore, in the event the beach restoration is not completed and maintained, the rights of the respective parties revert to the status quo ante.
To summarize, the Act effectuates the State's constitutional duty to protect Florida's beaches in a way that reasonably balances public and private interests. Without the beach renourishment provided for under the Act, the public would lose vital economic and natural resources. As for the upland owners, the beach renourishment protects their property from future storm damage and erosion while preserving their littoral rights to access, use, and view. Consequently, just as with the common law, the Act facially achieves a reasonable balance of interests and rights to uniquely valuable and volatile property interests.
Having explained how the Act effectuates the State's constitutional duty to protect Florida's beaches in a way that, at least facially, balances the interests and rights involved, we turn directly to the First District's decision.

C. The First District's Decision
As stated earlier, the First District determined that the Beach and Shore Preservation Act results in an unconstitutional taking of upland owners' rights to accretions and to contact with the water. In its opinion, the First District essentially employed the following three-step analysis: (1) it found sections 161.191 and 161.201, which fix the shoreline boundary and suspend the operation of the common law rule of accretion but preserve the littoral rights of access, view, and use after an ECL is recorded, facially unconstitutional; (2) then, because eminent domain proceedings did not occur as required by section 161.141, it found that the Act was unconstitutionally applied by the Department in this case; and (3) because littoral rights *1116 were unconstitutionally taken, it found that property rights had been unreasonably infringed, making it necessary for the Department to provide satisfactory evidence of sufficient upland interest pursuant to rule 18-21.004(3). Save Our Beaches, 31 Fla. L. Weekly at D1177, ___ So.2d at ____. We disagree.
We find facially constitutional the provisions of the Act that fix the shoreline boundary and that suspend the operation of the common law rule of accretion but preserve the littoral rights of access, view, and use after an ECL is recorded.[11] Therefore, we hold that the Act, on its face, does not unconstitutionally deprive upland owners of littoral rights without just compensation.
In explaining our disagreement with the First District, we first discuss how the First District failed to consider the doctrine of avulsion. The doctrine of avulsion is pivotal because, under that doctrine, the public has the right to reclaim its land lost by an avulsive event. We then address why, in the context of this Act, the littoral right to accretion is not an issue. Thereafter, we explain that there is no independent littoral right of contact with the water under Florida common law. Finally, we discuss why our decision in Belvedere is not applicable to the inquiry involved in this case.

(1) Doctrine of Avulsion
In its opinion, the First District stated that beach restoration under the Act "will cause the high water mark to move seaward and ordinarily this would result in the upland landowners gaining property by accretion." Save Our Beaches, 31 Fla. L. Weekly at D1177, ___ So.2d at ____. This statement fails to consider the doctrine of avulsion, most likely because the parties did not raise the issue before the First District. As a result, the First District never considered whether the Act is facially constitutional given the doctrine of avulsion.[12]
Under Florida common law, hurricanes, such as Hurricane Opal in 1995, are generally considered avulsive events that cause avulsion. See Peppe, 238 So.2d at 838; see also Ford v. Turner, 142 So.2d 335, 339 (Fla. 2d DCA 1962); Siesta Properties, Inc. v. Hart, 122 So.2d 218, 222-23 (Fla. 2d DCA 1960). As explained previously, avulsion is "the sudden or perceptible loss of or addition to the land by the action of the water or a sudden change in the bed of a lake or the course of a stream." Sand Key, 512 So.2d at 936; see also Peppe, 238 So.2d at 837; Siesta Props., 122 So.2d at 223.
Contrary to the First District's statement about accretion, under the doctrine of avulsion, the boundary between public lands and privately owned uplands remains the MHWL as it existed before the avulsive event.[13] In Peppe, this Court expressly applied the doctrine of avulsion and held that title to a narrow strip of land that was submerged until a 1926 hurricane brought it to the surface remained in the State, not *1117 the adjoining landowners. 238 So.2d at 838. This Court first determined that the hurricane was an avulsive event. Id. Then, we reasoned that the parcel in question "was originally sovereignty land; and it did not lose that character merely because, by avulsion, it became dry land." Id. Therefore, we found that "the plaintiff-respondents were charged with notice that the sudden avulsion of the parcel in controversy gave them no more title to it than they had to the water bottom before its emergence as dry land." Id. at 839.
Significantly, when an avulsive event leads to the loss of land, the doctrine of avulsion recognizes the affected property owner's right to reclaim the lost land within a reasonable time. See generally 1 Henry Philip Farnham, The Law of Waters and Water Rights § 74, at 331 (1904) ("If a portion of the land of the riparian [or littoral] owner is suddenly engulfed, and the former boundary can be determined or the land reclaimed within a reasonable time, he does not lose his title to it."). In State v. Florida National Properties, Inc., 338 So.2d 13 (Fla.1976), this Court specifically explained that affected property owners can return their property to its pre-hurricane status.[14] In Florida National Properties, littoral "owners had exercised self-help by dynamiting obstacles from a drainage canal to return [Lake Istokpoga] to an ordinary level ... following the historic 1926 hurricane." Id. at 16. This Court stated that the "self-help by the [littoral] owners did not affect [sic] a lowering of the water level below the normal high-water mark; instead, as the survey notes show, the action merely returned the water to its normal level and did not expose any lake bottom." Id. at 18. In that circumstance, the Court determined that the littoral owners retained title to the present MHWL, which represented the pre-hurricane MHWL, and to the land they had reclaimed through lawful drainage of the lake. Id.
To summarize, when the shoreline is impacted by an avulsive event, the boundary between public lands and private uplands remains the pre-avulsive event MHWL. Consequently, if the shoreline is lost due to an avulsive event, the public has the right to restore its shoreline up to that MHWL.
In light of this common law doctrine of avulsion, the provisions of the Beach and Shore Preservation Act at issue are facially constitutional. In the context of restoring storm-ravaged public lands, the State would not be doing anything under the Act that it would not be entitled to accomplish under Florida's common law. Like the common law doctrine of avulsion, the Act authorizes the State to reclaim its storm-damaged shoreline by adding sand to submerged sovereignty lands. See generally §§ 161.088, 161.091, 161.101. And similar to the common law, the Act authorizes setting the ECL and the boundary between sovereignty lands and private uplands at "the existing line of mean high water, bearing in mind ... the extent to which ... avulsion has occurred." See § 161.161(5). In other words, when restoring storm-ravaged shoreline, the boundary under the Act should remain the pre-avulsive event boundary.[15] Thus, because *1118 the Act authorizes actions to reclaim public beaches that are also authorized under the common law after an avulsive event, the Act is facially constitutional.

(2) Common Law Right to Accretion
Additionally, we disagree with the First District's determination that section 161.191(2) results in a facial and unconstitutional taking of the littoral right of accretion. We do not find the littoral right to accretion applicable in the context of this Act.
As we explained earlier, the right to accretion under Florida common law is a contingent right. It is a right that arises from a rule of convenience intended to balance public and private interests by automatically allocating small amounts of gradually accreted lands to the upland owner without resort to legal proceedings and without disturbing the upland owner's rights to access to and use of the water. See Medeira Beach, 272 So.2d at 212-13; Mexico Beach Corp. v. St. Joe Paper Co., 97 So.2d 708, 710 (Fla. 1st DCA 1957); see generally 1 Henry Philip Farnham, The Law of Waters and Water Rights § 71, at 326 (1904).
As discussed above, "[t]here are four reasons for the doctrine of accretion:"
(1) [D]e minimis non curat lex; (2) he who sustains the burden of losses and of repairs imposed by the contiguity of waters ought to receive whatever benefits they may bring by accretion; (3) it is in the interest of the community that all land have an owner and, for convenience, the riparian is the chosen one; (4) the necessity for preserving the riparian right of access to the water.
Medeira Beach, 272 So.2d at 212-13.
None of these doctrinal reasons apply here. First, the beach restoration provisions of the Act do not apply to situations involving de minimis additions or losses of land. See §§ 161.088, 161.101(1). More specifically, critically eroded shorelines can hardly be characterized as trifles with which the law does not concern itself. Cf. Black's Law Dictionary (8th ed.2004) (defining "de minimis" as "trifling; minimal" and "so insignificant that a court may overlook it in deciding an issue or case"). Similarly, the beach renourishment itself is a change to the shoreline that is more than de minimis. Second, by authorizing the creation of a buffer area of beach on sovereignty land, the Act removes the upland owner's concomitant risk of losses and repairs due to erosion. After renourishment, the risk of loss and repair lies more with the State than with the upland owner. Third, all land has an owner under the Act because the property line between private and public land is clearly and conveniently fixed at the ECL. See § 161.191(1). Fourth, the upland owner's littoral right of access is preserved under the Act. See *1119 § 161.201. Consequently, the common law rule of accretion, which is intended to balance private and public interests, is not implicated in the context of this Act.
Having explained our disagreement with the First District regarding the right to accretion, we now discuss the First District's analysis of the supposed independent right of contact with the water.

(3) Contact is Ancillary to the Littoral Right of Access
The First District concluded that, under section 161.191(1), upland owners "lose the right to have the property's contact with the water remain intact." Save Our Beaches, 31 Fla. L. Weekly at D1177, ___ So.2d at ____. However, under Florida common law, there is no independent right of contact with the water. Instead, contact is ancillary to the littoral right of access to the water.
The ancillary right to contact with the water exists to preserve the upland owner's core littoral right of access to the water. See Sand Key, 512 So.2d at 936 (stating that littoral property rights include "the right of access to the water, including the right to have the property's contact with the water remain intact"); see also Farnham, supra, § 62 ("The riparian owner is also entitled to have his contact with the water remain intact. This is what is known as the right of access."). We have never addressed whether littoral rights are unconstitutionally taken based solely upon the loss of an upland owner's direct contact with the water. But we have held that littoral rights are unconstitutionally taken when sovereignty lands are used in a way that deprives the upland owner of the right of access to the water. See Thiesen, 78 So. at 501 (finding that legislation allowing railway on sovereignty submerged lands unconstitutionally deprived upland owner of ingress and egress, i.e., access to the water, without just compensation); see also Webb, 82 So.2d 743 (finding that fill across small arm of lake constituted an infringement of upland owner's littoral right to access main part of lake); Ferry Pass, 48 So. at 646 (stating that the use of a river that deprived riparian owner of access to the water may be enjoined).
In this case, the Act expressly protects the right of access to the water, which is the sole justification for the subsidiary right of contact. The Act preserves the rights of ingress and egress and prevents the State from erecting structures upon the beach seaward of the ECL except as required to prevent erosion. See § 161.201. The Act also provides that the State has no intention "to extend its claims to lands not already held by it or to deprive any upland or submerged land owner of the legitimate and constitutional use and enjoyment of his or her property." § 161.141. At least facially, these provisions ensure that the upland owner's access to the water remains intact. Therefore, the rationale for the ancillary right to contact is satisfied.
Furthermore, it is important to understand that contrary to what might be inferred from the First District's conclusion regarding contact, there is no littoral right to a seaward boundary at the water's edge in Florida. Rather, as explained previously, the boundary between sovereignty lands and private uplands is the MHWL, which represents an average over a nineteen-year period. Although the foreshore technically separates upland property from the water's edge at various times during the nineteen-year period, it has never been considered to infringe upon the upland owner's littoral right of access, which the ancillary right to contact is meant to preserve. Admittedly, the renourished beach may be wider than the typical foreshore, *1120 but the ultimate result is the same.[16] Direct access to the water is preserved under the Act. In other words, because the Act safeguards access to the water and because there is no right to maintain a constant boundary with the water's edge, the Act, on its face, does not unconstitutionally eliminate the ancillary right to contact.
Lastly, we briefly explain our disagreement with the First District's use of Belvedere to discount the Act's express preservation of littoral rights in section 161.201.

(4) Belvedere
In its opinion, the First District concluded that "Belvedere controls by explicitly holding that [littoral] rights cannot be constitutionally reserved to the landowners as described in section 161.201." 31 Fla. L. Weekly at D1177, ___ So.2d at ____. Contrary to the First District, we do not find our decision in Belvedere controlling or even particularly relevant.
In Belvedere, the Department of Transportation sought to acquire uplands in fee simple absolute, while expressly reserving the littoral rights to the former upland owners. 476 So.2d at 649. The Department severed the littoral rights in an attempt to limit the compensation for uplands in eminent domain proceedings. In Belvedere, we were particularly concerned that the former upland owners did not have the actual ability to exercise any of their reserved littoral rights since they held no easement or right to enter upon their former land. See id. at 651 (quoting Belvedere Dev. Corp. v. Div. of Admin., 413 So.2d 847, 851 (Fla. 4th DCA 1982) (Hersey, J., specially concurring)). Therefore, we held in Belvedere that littoral rights "cannot be severed by condemnation proceedings without the consent of the upland owner." Id. at 653. In so holding, we emphasized that our decision was limited to the context of condemnation of upland property. See id. at 652.
This case is clearly distinguishable from Belvedere. STBR is not arguing that the Act necessitates the condemnation of uplands. Thus, our holding that was limited to the context of condemnation of upland property is inapplicable. Furthermore, in contrast to the circumstances of Belvedere, upland owners under the Act continue to have the ability to exercise their littoral rights to access, use, and view. See §§ 161.201; 161.141. Given these significant differences, Belvedere does not apply here.

III. CONCLUSION
As we have explained, the Beach and Shore Preservation Act effectuates the State's constitutional duty to protect Florida's beaches. And, like Florida common law, the Act facially achieves a reasonable balance between public and private interests in the shore. Specifically, the Act benefits upland owners by restoring lost beach, by protecting their property from future storm damage and erosion, and by preserving their littoral rights to use and view. The Act also benefits upland owners by protecting their littoral right of access to the water, which is the sole justification for the ancillary right of contact. Additionally, the Act authorizes actions to reclaim public beaches that are also authorized under the common law after an avulsive event. Furthermore, the littoral right to accretion is not implicated by the Act because the reasons underlying this *1121 common law rule are not present in this context.
In light of the above, we find that the Act, on its face, does not unconstitutionally deprive upland owners of littoral rights without just compensation. Consequently, we answer the rephrased certified question in the negative and quash the decision of the First District. And we again emphasize that our decision in this case is strictly limited to the context of restoring critically eroded beaches under the Beach and Shore Preservation Act.
It is so ordered.
QUINCE, C.J., ANSTEAD and PARIENTE, JJ., and CANTERO, Senior Justice, concur.
WELLS and LEWIS, JJ., dissent with opinions.
WELLS, J., dissenting.
I would answer the certified question in the affirmative. I would approve the decision of the First District Court of Appeal.
I am in substantial agreement with the conclusions of Justice Lewis in his dissenting opinion. Since the district court dealt with this case as an applied constitutional challenge, I think we must also do so.
It appears to me that this Court's precedent controlling this case is in State v. Florida National Properties, Inc., 338 So.2d 13 (Fla.1976); Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd., 512 So.2d 934 (Fla.1987); and Belvedere Development Corp. v. Department of Transportation, 476 So.2d 649 (Fla.1985).
There can be no doubt that beach restoration is of critical and vital interest in Florida. However, the legislative setting of this erosion control line does eliminate valuable property rights which have been recognized by this Court. Thus, the act can be saved by the payment of just compensation but cannot be constitutionally applied without it.
LEWIS, J., dissenting.
I cannot join the majority because of the manner in which it has "butchered" Florida law in its attempted search for equitable answers to several issues arising in the context of beach restoration in Florida. In attempting to answer these questions, the majority has, in my view, unnecessarily created dangerous precedent constructed upon a manipulation of the question actually certified. Additionally, I fear that the majority's construction of the Beach and Shore Preservation Act is based upon infirm, tortured logic and a rescission from existing precedent under a hollow claim that existing law does not apply or is not relevant here. Today, the majority has simply erased well-established Florida law without proper analysis, and has further disregarded the manner in which the parties pled, and the lower court analyzed, an as-applied constitutional challenge. As the majority recognizes, the local governmental entities have yet to properly establish that the erosion-control line ("ECL") represents the pre-avulsion or pre-critical-erosion mean high-water line ("MHWL"), which in my view, is a critical factor in determining whether the State and local governmental entities have constitutionally applied the Act to the six property-owner members of Stop the Beach Renourishment, Inc. ("STBR").[17]
*1122 First, the logic upon which the entire foundation of the majority opinion is based inherently assumes that contact with the particular body of water has absolutely no protection and is just some ancillary concept that tags along with access to the water and seemingly possesses little or no independent significance. I could not disagree more. By essential, inherent definition, riparian and littoral property[18] is that which is contiguous to,[19] abuts,[20] borders,[21] adjoins,[22] or touches water. See, e.g., Brickell v. Trammell, 77 Fla. 544, 82 So. 221, 229-30 (1919) (explaining that under Spanish civil law and English common law, private littoral ownership extended to the high-water mark); Miller v. Bay-to-Gulf, Inc., 141 Fla. 452, 193 So. 425, 427 (1940) ("[I]t is essential that [the property owners] show the ordinary high water mark or ordinary high tide of the Gulf of Mexico extended to their westerly boundary in order for them to be entitled to any sort of [littoral] rights...." (emphasis supplied)); Thiesen v. Gulf, Fla. & Ala. Ry. Co., 75 Fla. 28, 78 So. 491, 500 (1918) ("At common law lands which were bounded by and extended to the high-water mark of waters in which the tide ebbed and flowed were riparian or littoral to such waters." (emphasis supplied)). In this State, the legal essence of littoral or riparian land is contact with the water. Thus, the majority is entirely incorrect when it states that such contact has no protection under Florida law and is merely some "ancillary" concept that is subsumed by the right of access. In other words, the land must touch the water as a condition precedent to all other riparian or littoral rights and, in the case of littoral property, this touching must occur at the MHWL.
I agree with former Judge Hersey of the Fourth District Court of Appeal, who urged this Court to take action in Belvedere Development Corp. v. Division of Administration, 413 So.2d 847 (Fla. 4th DCA 1982):
To speak of riparian or littoral rights unconnected with ownership of the shore is to speak a non sequitur. Hopefully, the Supreme Court will take jurisdiction and extinguish this rather ingenious but hopelessly illogical hypothesis.

Id. at 851 (Hersey, J., specially concurring) (emphasis supplied). Later, this Court did act in Belvedere and agreed with Judge Hersey, quoting parts of his opinion at length. See Belvedere Dev. Corp. v. Dep't of Transp., 476 So.2d 649, 651-52 (Fla. *1123 1985). Most assuredly, Belvedere established clear principles of law with regard to riparian and littoral property, which the majority views as an inconvenient detail of Florida legal precedent and simply unnecessarily discards with one sentence and no analysis as not "controlling or even particularly relevant." Majority op. at 1120. Notwithstanding its apparent inconvenience to the majority, Belvedere continues to stand for the principle of law that riparian or littoral rights are generally inseparable from riparian or littoral uplands in this State. See 476 So.2d at 651-52; see also § 253.141(1), Fla. Stat. (2005) ("Riparian rights ... are appurtenant to and are inseparable from the riparian land." (emphasis supplied)). Today, the majority has returned to a "hopelessly illogical hypothesis" without even an attempt to advance some rational analysis that conforms to the Florida Constitution, our common law, and section 253.141, Florida Statutes.
Following Belvedere only a short two years later, this Court again directly addressed the fundamental principles of law applicable to riparian and littoral property, its owners, and their correlative rights in Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd., 512 So.2d 934 (Fla.1987). In very clear and unmistakable language, we stated:
This Court has expressly adopted the common law rule that a riparian or littoral owner owns to the line of the ordinary high water mark on navigable waters. We have also held that riparian or littoral rights are legal rights and, for constitutional purposes, the common law rights of riparian and littoral owners constitute property. Riparian and littoral property rights consist not only of the right to use the water shared by the public, but include the following vested rights: (1) the right of access to the water, including the right to have the property's contact with the water remain intact ....
Id. at 936 (citations omitted) (emphasis supplied). The majority now avoids this inconvenient principle of law  and firmly recognized and protected property right  by improperly describing the littoral property and its owner as having "no independent right of contact with the water," and by mischaracterizing the significant right of contact as being only "ancillary" to the right of access. Majority op. at 1119 (emphasis supplied). Any claim that this existing precedent and law does not apply here is based upon empty, misguided logic that discounts the essential nature of littoral property. At least in theory, the MHWL is the location at which littoral property contacts the sea,[23] and even the majority seems to accept this principle. As a definitional matter, without such contact with the water, littoral property does not exist in Florida. See, e.g., Ferry Pass Inspectors' & Shippers' Ass'n v. White River Inspectors' & Shippers' Ass'n, 57 Fla. 399, 48 So. 643, 644 (Fla.1909) ("Riparian rights are incident to the ownership of lands contiguous to and bordering on navigable waters. The common-law rights of riparian owners with reference to the navigable waters are incident to the ownership of the uplands that extend to [the] *1124 high-water mark." (emphasis supplied)); § 253.141(1), Fla. Stat. (2005) ("Riparian rights are those incident to land bordering upon navigable waters. ... The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian rights may attach." (emphasis supplied)); cf. art. X, § 11, Fla. Const. ("The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people." (emphasis supplied)). Although the MHWL may be a "dynamic" boundary, until today, Florida has judicially and legislatively accommodated these variations without emasculating the underlying private-property rights and ownership principles. Our common law, statutes, and Constitution indicate that the right of contact with the water is neither "independent of," nor "ancillary to," riparian and littoral property, its ownership, and associated protected rights. That contact is inherent in, and essential to, the very heart of the property we discuss. Without bordering on, lying contiguous to, or abutting the water, the property ceases to be "riparian" or "littoral" by working definition:
The ordinary high water mark is well established as the dividing line between private riparian and sovereign or public ownership of the land beneath the water. This dividing line was not chosen arbitrarily.... "Any other rule would leave riparian owners continually in danger of losing access to water which is often the most valuable feature of their property, and continually vulnerable to harassing litigation challenging the location of the original water lines."
Bd. of Trs. of the Internal Improvement Fund v. Medeira Beach Nominee, Inc., 272 So.2d 209, 213 (Fla. 2d DCA 1973) (quoting Hughes v. Washington, 389 U.S. 290, 293-94, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967)); see also § 253.141(1), Fla. Stat. (2005).
The problem with the underlying logic and reasoning of the majority is not really a matter of just a few yards of sand but is, instead, its failure to acknowledge and account for the fundamental result that occurs in the absence of the inherent right of contact with the water. Under the legal principle adopted by the majority, the Sovereign could now create, widen, and extend "sovereign" land or a portion of beach between what should represent the status-quo-ante MHWL (also known as the ECL) and the water by hundreds or even thousands of yards without impacting the rights of riparian or littoral property owners. This new-found governmental power could be used to create extended state-owned or sovereign lands between the once-private riparian or littoral property and the water, thereby effectively severing private property from the sea, lakes, and rivers, which instantly converts ocean-front, gulf-front, lake-front, and river-front property into something far less.[24] The *1125 protection of property rights in Florida is an essential element of our organic law, finding a home in multiple constitutional provisions. See, e.g., art. I, §§ 2, 9, Fla. Const. In a similar manner, there are constitutional limitations upon any encroachment on our property rights. See art. X, § 6, Fla. Const. In this context, we have recognized the property value of contact with the water:

The fronting of a lot upon a navigable stream or bay often constitutes its chief value and desirability, whether for residence or business purposes. The right of access to the property over the waters, the unobstructed view of the bay, and the enjoyment of the privileges of the waters incident to ownership of the bordering land would not, in many cases, be exchanged for the price of an inland lot in the same vicinity. In many cases, doubtless, the riparian rights incident to the ownership of the land were the principal, if not sole, inducement leading to its purchase by one and the reason for the price charged by the seller.

Thiesen, 78 So. at 507 (emphasis supplied).
In addition to discounting the right of contact with the water, the majority skims the law with regard to riparian and littoral property ownership, and associated rights, to proceed into a discussion of erosion, accretion, reliction, and avulsion as though those concepts provide the end-all-be-all response to every question of riparian and littoral property rights. Although the Sovereign may have the right to reclaim land lost through an avulsive event, the littoral-upland property owner also maintains property rights to land submerged through avulsion. See State v. Fla. Nat'l Props., Inc., 338 So.2d 13, 18-19 (Fla. 1976). The upland owner continues to hold private-property rights to the extent and location of the MHWL as it existed before the storm (i.e., the avulsive event). In fact, even the majority affirmatively states: "Consequently, if the shoreline is lost due to an avulsive event, the public [through the Sovereign] has the right to restore its shoreline up to that MHWL." Majority op. at 1117 (emphasis supplied). The majority opinion is actually replete with inconsistent principles. However, this particular recognition creates an internal inconsistency within the majority opinion because the opinion also states that there is no right for the littoral-upland property owner to contact the sea at the MHWL. The majority adds to this confusion when it recognizes that "when restoring storm-ravaged shoreline, the boundary under the Act should remain the pre-avulsive event boundary." Id. at 29 (emphasis supplied). Such language indicates that even the majority recognizes the definitional, essential requirement in Florida that littoral property does not exist in the absence of contact with the sea at the MHWL, and that this requirement and right continues "under the Act." This position directly conflicts with its unfounded contention that "there is no independent right of contact with the water." Id. at 31.
The majority thus overlooks that the State may only restore the beach to the pre-avulsion or pre-critical-erosion MHWL because of the quintessential aspect of littoral property under Florida law. As the Sovereign, the State owns the foreshore in trust for the public, which is the land *1126 between the MHWL and the low-water mark, while, in contrast, the littoral-upland holder's ownership continues until, and includes, the MHWL. See, e.g., White v. Hughes, 139 Fla. 54, 190 So. 446, 449 (1939); see also art. X, § 11, Fla. Const; § 253.141(1), Fla. Stat. (2005); § 161.141, Fla. Stat. (2005) ("[T]here is no intention on the part of the state to extend its claims to lands not already held by it or to deprive any upland or submerged land owner of the legitimate and constitutional use and enjoyment of his or her property." (emphasis supplied)). Thus, the decision of the majority to grant the Sovereign the property right or authority to sever once riparian or littoral property from the water by creating as much dry land between the property and the water as the government may please is inconsistent with maintaining the MHWL. This separation may be de minimis, or a matter of a few yards, but it could also be a matter of hundreds or even thousands of yards upon application of the principle announced today that waterfront property does not enjoy the protection of a continuing right of contact with the water. Under the majority's analysis, this State has ceased to protect the condition precedent to all other littoral rights: contact with the sea.
Unlike the majority, I would not interpret the Act to permit a result that destroys the essential nature of riparian or littoral property. If a beach were restored and renourished without altering the location of the pre-critical-erosion MHWL (i.e., refilling only to restore the MHWL to the ECL), the Act could be applied without unconstitutionally severing riparian or littoral property from its contact with the water. In contrast, restoration and renourishment in the form of filling currently submerged property to separate riparian or littoral property from the resulting MHWL simply violates all prior notions of waterfront property rights in Florida. See, e.g., Sand Key, 512 So.2d at 936; Kendry v. State Road Dep't of Fla., 213 So.2d 23, 27-28 (Fla. 4th DCA 1968); § 253.141(1), Fla. Stat. (2005).
I suggest that contact with the water by riparian or littoral property is not ancillary, independent, or subsidiary to such property but is essential and inherent to its legal definition and is an indispensible predicate for the private owners' possession of other associated rights. Accordingly, I cannot agree that the Sovereign may create a substantially wider "foreshore," which unnecessarily destroys the inherent and essential nature of riparian and littoral property along with valuable property rights. Under our common law, article X, section 11 of the Florida Constitution, and section 253.141, Florida Statutes, the Sovereign only owns the land between the MHWL and the low-water mark (along with the land under navigable waters), and the private littoral-upland owner owns the land up to, and including, the MHWL. I would not interpret the Act to contradict this prior-existing, foundational law.
In contrast, the majority has done just that and, in the process, has destroyed the inherent and essential nature of privately held littoral property  contiguity with the sea. Furthermore, the majority has also transformed the certified question from one of constitutionality "as applied" to one of "facial validity." See majority op. at 1105. If the Court construed the Act in a manner that did NOT sever riparian or littoral property from the water, we could maintain its facial validity. Therefore, the Act may be applied constitutionally, but not in the manner espoused by the majority.
Under appropriate circumstances (e.g., where the ECL does not correspond to the restored MHWL), the property owners should retain the right to bring as-applied *1127 challenges to this beach-restoration project. See art. X, § 6, Fla. Const. (stating that the government will not take private property without providing full compensation); § 161.212, Fla. Stat. (2005) (indicating that the provisions and remedies provided in the Act are "cumulative and shall not ... abrogate any other remedies provided by law"). That appears to be precisely what occurred in this case. Below, STBR challenged the local governmental entities' placement of the ECL[25] and, here, the majority recognizes that it is unclear whether the ECL represents the status-quo-ante MHWL. See majority op. at ____ n. 15. Further, although the majority mischaracterizes this action as a facial challenge, it states that "if the ECL does not represent the pre-hurricane MHWL, the resulting boundary between sovereignty and private property might result in the State laying claim to a portion of land that, under the common law, would typically remain with the private owner." Id. Such state action constitutes a compensable taking, and therefore I dissent with regard to the majority's reversal of the First District and its mischaracterization of this action as a facial challenge. In spite of the majority's desire to destroy protected private-property rights, nothing in its opinion  which addresses a judicially rewritten facial challenge  prevents these property owners from bringing later as-applied challenges to this beach-restoration project.
Here, by disclaiming (1) any interest in land that it does not already own "as sovereign titleholder"[26] and (2) any intent to deprive property owners of their littoral rights (other than accreted portions of land which the State may readjust to maintain the reestablished MHWL at the recorded ECL),[27] the State could sustain the common-law rule and remain true to its definition of littoral and riparian rights contained within section 253.141(1), Florida Statutes: "The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian [or littoral] rights may attach." § 253.141(1), Fla. Stat. (2005) (emphasis supplied). If the State or applicable "governmental agency" does not carry out its statutory duty to maintain the reestablished MHWL at the ECL through renourishment efforts, it risks returning the shore to its pre-restoration status, which means that the MHWL would naturally move away from the ECL and contiguous ownership would remain with the littoral-upland owners, not the State. See art. X, § 11, Fla. Const; §§ 161.211(2)-(3), 253.141(1), Fla. Stat. (2005).
Thus, if the State and our local governments restore and renourish our beaches so that the reestablished MHWLs remain at the ECLs, which may involve additional redistributions of accreted and eroded sand, then they could apply the Act in a constitutional manner because littoral property would retain its required contact with the sea.[28] Any other interpretation of *1128 this legislation would lead to several constitutional problems with regard to uncompensated takings. I cannot endorse any construction of the Act that creates, rather than alleviates, constitutional concerns.
I recognize that beach restoration and renourishment are critical in Florida and present many difficult and complex issues. I have no doubt that the majority has attempted to balance the respective interests involved to reach a workable solution. However, this legislation has not been constitutionally applied in this case, and no matter the complexity or difficulty, I suggest that the private-property rights destroyed today are also critical and of fundamental importance. As constitutionally protected rights slide, it becomes more difficult to protect others. The rights inherent in private-property ownership are at the foundation of this nation and this State. I simply cannot join a decision which, in my view, unnecessarily eliminates private-property rights without providing "full compensation" as required by article X, section 6 of the Florida Constitution. While the Act was applied in an unconstitutional manner here, it may be constitutionally applied under other circumstances in a manner that preserves both the intent of the Legislature and the quintessential nature of littoral and riparian property in Florida.
NOTES
[1] We must note that the First District should have refrained from considering what is essentially a facial challenge since Stop the Beach Renourishment (STBR) acknowledged that it was a party in circuit court to a facial challenge of the same act. See Key Haven Assoc. Enters. v. Bd. of Trs. of the Internal Improvement Trust Fund, 427 So.2d 153, 157 (Fla. 1982) (explaining that if a party chooses to pursue a facial challenge in circuit court, the party is foreclosed from proceeding with a facial challenge before the district court in its appeal of final agency action).
[2] For ease of reading, we refer generally to the statutory provisions at issue as "the Beach and Shore Preservation Act" or the "Act." However, this case only concerns the following provisions of part I of chapter 161, Florida Statutes (2005): sections 161.088, 161.101, 161.141, 161.161, 161.191, 161.201, and 161.211.
[3] As noted by the First District, cases and statutes "have used `riparian owner' broadly to describe all waterfront owners." Save Our Beaches, 31 Fla. L. Weekly at D1176, ___ So.2d at ____ (quoting Bd. of Trs. of the Int. Imp. Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934, 936 (Fla. 1987)). Indeed, the use of the term riparian in the Beach and Shore Preservation Act encompasses all waterfront owners' rights. However, "[t]he term `riparian owner' applies to waterfront owners along a river or stream, and the term `littoral owner' applies to waterfront owners abutting an ocean, sea, or lake." Sand Key, 512 So.2d at 936; see also John M. Gould, A Treatise on the Law of Waters § 148 at 297, n. 1 (1900) ("Littoral is derived from Latin litus, the sea-shore."). Because this case involves beachfront owners, we use the term "littoral" to describe the rights at issue.
[4] This shoreline was subsequently damaged by Hurricane Georges (1998), Tropical Storm Isidore (2002), and Hurricane Ivan (2004).
[5] STBR is a not-for-profit association that consists of six owners of beachfront property in the area of the proposed project. At the administrative and district level, Save Our Beaches, Inc. was a co-party. The administrative law judge and the First District determined that Save Our Beaches lacked standing to maintain its claims as its approximately 150 members were not necessarily owners of beachfront property in the affected area. Save Our Beaches, 31 Fla. L. Weekly at D1175, ___ So.2d at ____. Save Our Beaches is no longer a party to the litigation.
[6] At the administrative hearing, the only remaining issues were: (1) whether there was standing; (2) whether Destin and Walton County gave reasonable assurance that applicable water quality standards will not be violated; and (3) whether Destin and Walton County have obtained, or are able to obtain, all requisite private property rights necessary to implement the proposed project. In its appeal, STBR did not seek reversal based on these issues. See Save Our Beaches, 31 Fla. L. Weekly at D1175, ___ So.2d at ____.
[7] The Florida Administrative Code defines "critically eroded shoreline" as

a segment of shoreline where natural processes or human activities have caused, or contributed to, erosion and recession of the beach and dune system to such a degree that upland development, recreational interests, wildlife habitat or important cultural resources are threatened or lost. Critically eroded shoreline may also include adjacent segments or gaps between identified critical erosion areas which, although they may be stable or slightly erosional now, their inclusion is necessary for continuity of management of the coastal system or for the design integrity of adjacent beach management projects.
Fla. Admin. Code R. 62B-36.002(4).
[8] It is important to note that the question of a fixed boundary at the ECL only applies to the beaches "of the Atlantic Ocean, the Gulf of Mexico, and the bays, lagoons and other tidal reaches thereof." Specifically, section 161.151, Florida Statutes (2005), defines an ECL, or "erosion control line," as

the line determined in accordance with the provisions of ss. 161.141-161.211 which represents the landward extent of the claims of the state in its capacity as sovereign titleholder of the submerged bottoms and shores of the Atlantic Ocean, the Gulf of Mexico, and the bays, lagoons and other tidal reaches thereof on the date of the recording of the survey as authorized in s. 161.181.
[9] The nature of upland owners' littoral rights is considered a matter of state law. See Arkansas v. Tennessee, 246 U.S. 158, 176, 38 S.Ct. 301, 62 L.Ed. 638 (1918); Barney v. City of Keokuk, 94 U.S. 324, 337, 24 L.Ed. 224 (1876); Webb v. Giddens, 82 So.2d 743, 744 (Fla.1955). As a result, the law regarding littoral rights varies among the states. For example, in contrast to Florida, littoral rights in Mississippi "are not property rights per se; instead they are mere licenses or privileges" that can be revoked. Miss. State Highway Comm'n v. Gilich, 609 So.2d 367, 375 (Miss. 1992). And, North Carolina courts have held that littoral rights are subordinate to public trust rights, meaning legislative authority to protect public trust rights in North Carolina is limited by an upland owner's right to retain some use or value in the upland property. See Weeks v. N.C. Dep't of Natural Res., 97 N.C.App. 215, 388 S.E.2d 228, 234 (1990).
[10] We recognize that the littoral rights to access, use, and view are different from so-called "true easements" in that littoral rights are incidental to littoral ownership and do not require a separate act of creation. See Jon W. Bruce, The Law of Easements and Licenses in Land § 1.02 (1995). However, once acquired, the nature of the two different categories of easements is generally the same. See Harry A. Bigelow, Natural Easements, 9 Ill. L.Rev. 541, 542 (1915).
[11] Because we conclude that the Act is facially constitutional, we need not address the other portions of the First District's analysis.
[12] As stated earlier, "a determination that a statute is facially unconstitutional means that no set of circumstances exists under which the statute would be valid." Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d at 256.
[13] As Joseph J. Kalo explains, "at common law, an avulsive change could result in the loss of that valuable feature of oceanfront property ownership  direct contact with and access to the ocean." North Carolina Oceanfront Property and Public Waters and Beaches: The Rights of Littoral Owners in the Twenty-First Century, 83 N.C. L.Rev. 1427, 1438 (2004).
[14] This right to reclaim is consistent with other jurisdictions' determinations that, under the common law, littoral/riparian owners (including government entities) do not lose title and rights to land lost after an avulsive event if it is subsequently reclaimed by the littoral/riparian owners. See, e.g., City of Chicago v. Ward, 169 Ill. 392, 48 N.E. 927 (1897); Fowler v. Wood, 73 Kan. 511, 85 P. 763 (1906); City of New York v. Realty Assocs., 256 N.Y. 217, 176 N.E. 171 (1931).
[15] It is not clear from the record whether or not the ECL recorded in this case represents the pre-hurricane MHWL. If it represents the pre-hurricane MHWL, there would be no difference between the boundary under the common law and the boundary under the Act. In contrast, if the ECL does not represent the pre-hurricane MHWL, the resulting boundary between sovereignty and private property might result in the State laying claim to a portion of land that, under the common law, would typically remain with the private owner. However, because STBR alleges what is essentially a facial challenge, it is unnecessary for this Court to address this as-applied issue. Indeed, it is possible that STBR is without standing to raise this as-applied issue since its resolution might depend upon the assessment of particular facts and defenses inuring to each parcel and each individual owner. See Fla. Home Builders Ass'n v. Dep't of Labor & Employment Sec., 412 So.2d 351, 353 (Fla. 1982) (delineating the test for associational standing); Palm Point Prop. Owners' Ass'n v. Pisarski, 626 So.2d 195 (Fla. 1993) (holding that a homeowners association lacks associational standing to enforce restrictive covenants applicable to its members' properties).
[16] Of course, the State is not free to unreasonably distance the upland property from the water by creating as much dry land between upland property and the water as it pleases. There is a point where such a separation would materially and substantially impair the upland owner's access, thereby resulting in an unconstitutional taking of littoral rights. See Lake Islands, 407 So.2d 189; Webb, 82 So.2d 743; cf. Duval, 77 So.2d 431.
[17] Below, unchallenged testimony established that each of these members owned gulf-front property within the area affected by the restoration and renourishment project. As the First District observed:

[A]ll of the individual members ... own property in the affected area. Competent substantial evidence for this factual finding by the [administrative-law judge] is found in the unrebutted testimony of Mr. Slade Lindsey, one of the six members. Mr. Lindsey testified that all six members owned waterfront property, up to the mean high water line, in the area of the proposed project. The ALJ found that all six members would be affected by the project if it significantly reduced water quality, infringed on [littoral] rights, or proceeded without their required consent....
Save Our Beaches, Inc. v. Fla. Dep't of Envtl. Prot., 31 Fla. L. Weekly D1173, D1175, 2006 WL 1112700, at *6, ___ So.2d ___, ___ (Fla. 1st DCA Apr.28, 2006).
[18] "Riparian" generally refers to land touching a river or stream, and "littoral" generally refers to land touching the ocean, a sea, or a lake; however, our case law and the Florida Statutes often use the terms interchangeably.
[19] "Contiguous, adj.: 1. Touching at a point or along a boundary." Black's Law Dictionary 338 (8th ed.2004).
[20] "Abut, vb.: To join at a border or boundary; to share a common boundary with." Black's Law Dictionary 1 (8th ed.2004).
[21] "Border, vb.: 2.[T]o touch at the edge or boundary." Merriam Webster's Collegiate Dictionary 133 (10th ed.1993).
[22] "Adjoining, adj.: Touching; sharing a common boundary." Black's Law Dictionary 44 (8th ed.2004).
[23] Section 177.27(15)-(16), Florida Statutes (2005), provides the following relevant definitions:

"Mean high water" means the average height of the high waters over a 19-year period. For shorter periods of observation, "mean high water" means the average height of the high waters after corrections are applied to eliminate known variations and to reduce the result to the equivalent of a mean 19-year value.
"Mean high-water line" means the intersection of the tidal plane of mean high water with the shore.
[24] In response, the majority states:

Of course, the State is not free to unreasonably distance the upland property from the water by creating as much dry land between upland property and the water as it pleases. There is a point where such a separation would materially and substantially impair the upland owner's access, thereby resulting in an unconstitutional taking of littoral rights.
Majority op. at 1120 n. 16 (emphasis supplied). However, the majority never provides any guidance or a limiting principle concerning when governmental creation of new land seaward of the ECL would reach "a point" that materially impaired the upland owners' littoral rights. Further, the majority's interpretation of the Act is completely unsupported by Florida law, which provides that the right of contact is a condition precedent to all other littoral rights.
Notwithstanding its protestations to the contrary, the majority's analysis thus destroys the foundation of all other littoral and riparian rights in Florida  the right of contact with the water. Further, despite the majority's efforts to marginalize this right, contact with the water demands protection under Florida law because it is part of our system of private-property ownership.
[25] See Save Our Beaches, 31 Fla. L. Weekly at D1173, ___ So.2d at ___.
[26] § 161.151(3), Fla. Stat. (2005); see also § 161.141, Fla. Stat. (2005).
[27] See §§ 161.141, 161.191, 161.201, Fla. Stat. (2005).
[28] Based on this analysis, the Act may be subject to a facial construction that preserves its constitutionality (although it was applied in an unconstitutional manner in this case). However, I cannot help but observe that the Legislature could have largely avoided any dispute in this context if it had simply produced legislation that did not require it to take title to land for the purposes of restoring and renourishing Florida's beaches.

The same objective could be accomplished through the deposit of sand on the relevant beach with the understanding that the dividing line between sovereign and private lands would remain the dynamic MHWL. This would cost the State, our local governments, and Florida's taxpayers far less capital by avoiding the constant need to redistribute sand to maintain the restored MHWL at the recorded ECL or the need to exercise eminent-domain powers.