# SIXTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 6D2024-1898
Lower Tribunal No. 2021-CA-11826-O

_____

BRADLEY GEISE and SARAH GEISE,

Appellants,

v.

PETER FLECK and KARI FLECK,

Appellees.

_____

Appeal from the Circuit Court for Orange County.
Eric J. Netcher, Judge.

April 2, 2026

PRATT, J.

This appeal involves a riparian-rights-related dispute between two sets of landowners whose adjacent parcels of private property border the same lake. We have jurisdiction. *See* art. V, § 4(b)(1), Fla. Const. Appellees' property includes a home set back from the lake water's edge. It also includes a dock and connected boathouse, both of which are located upon the waters of the lake beyond the

boundaries of Appellees' property.[1] Importantly, the lake is comprised of sovereign submerged land—owned by the State of Florida and held in trust by it for those who have riparian rights to the lake—and the Court is unaware of any statute that grants Appellants a right to an equitable distribution of the lake's sovereign submerged land beyond the boundary of their private property.

Below, Appellants filed suit, seeking a declaratory judgment and a mandatory injunction requiring Appellees to substantially modify their dock/boathouse to protect several of Appellants' riparian rights, including Appellants' rights to view and access the lake. A bench trial was held on Appellants' complaint. Following the bench trial, the trial court declined the parties' invitation to neatly apportion the metes and bounds of the parties' respective riparian rights with regards to the state-owned sovereign submerged land located beyond their respective property boundaries. Instead, the trial court applied a test of reasonableness and equitably determined that Appellees' dock/boathouse did not unreasonably interfere with any of Appellants' lake-related riparian rights. For the reasons explained below, we affirm.

---

[1] Appellants' property likewise includes a home set back from the lake water's edge, as well as a dock and connected boathouse located upon the waters of the lake beyond Appellants' property. This appeal presents no issues regarding Appellants' dock/boathouse.

2

I

Appellees have owned their private property located adjacent to Lake Down since 1999. In some shape or form, a dock/boathouse has extended from their private property onto the lake since 1983. Over the years, Appellees have twice removed and reconstructed the dock/boathouse, with the most recent rebuild completed in 2022.

Appellants purchased their private property located adjacent to Lake Down in 2017. Thereafter, a disagreement arose between the parties regarding whether Appellees' dock/boathouse interfered with Appellants' riparian rights to the lake. As a result, Appellants filed a lawsuit challenging the current version of Appellees' dock/boathouse. Appellants' complaint listed causes of action for ejectment, trespass, and declaratory judgment—as well as a separate request for injunctive relief—all based on the same theory of riparian rights.[2,3]

The trial court held a three-day bench trial. During the bench trial, the trial court considered the testimony of Bradley Geise, Peter Fleck, Appellants' expert Dr.

---

[2] Although the complaint referred to the request for injunctive relief as a cause of action, in actuality the request for injunctive relief was a request for a remedy—not an independent cause of action—premised on the complaint's causes of action for ejectment, trespass, and declaratory judgment.

[3] The complaint also listed an additional request for injunctive relief unrelated to Appellants' riparian rights. That request for injunctive relief was denied by the trial court and is not at issue in this appeal.

Tony Nettleman, the stipulated testimony of a witness from the Florida Department of Environmental Projection, and the numerous documents admitted into evidence. Following the bench trial, the trial court entered a final judgment and then held a hearing on Appellants' motion for rehearing and clarification. Thereafter, the trial court entered an amended final judgment which, among other things, determined that "the proper inquiry [in this case] is whether one riparian owner's exercise of his rights unreasonably interferes with another riparian owner's rights." Within the amended final judgment, the trial court made a number of findings based on the evidence presented at trial, including that the land located beneath the waters of the lake and beyond the parties' respective private properties is sovereign submerged land owned by the State of Florida;[4] that Appellees received an exemption and a compliance letter from the Florida Department of Environmental Protection regarding Appellees' dock/boathouse;[5] that notwithstanding Appellees' dock/boathouse, Appellants can view the waters of the lake beyond their private property; that notwithstanding Appellees' dock/boathouse, Appellants have an excellent view over the waters of the lake, including a view to the center of the lake; that notwithstanding Appellees' dock/boathouse, Appellants can access the waters

_____

[4] This point was also undisputed at the bench trial.

[5] This appeal does not seek judicial review of administrative action pursuant to Florida law. *See, e.g.*, art. V, § 4(b)(2), Fla. Const.; § 120.68, Fla. Stat.; *see generally, e.g.*, ch. 120, Fla. Stat.

of the lake from their private property; and that notwithstanding Appellees' dock/boathouse, Appellants have an unobstructed and non-interfered ability to access the lake from their private property. The trial court also carefully examined and distinguished the Florida Supreme Court's decision in *Hayes v. Bowman*, 91 So. 2d 795 (Fla. 1957). Ultimately, the trial court weighed the parties' competing evidence, determined in relevant part that Appellees' dock/boathouse does not unreasonably interfere with Appellants' riparian rights of access to the lake or view of the lake, and entered judgment in favor of Appellees against Appellants with respect to ejectment, trespass, declaratory judgment, and injunctive relief.

This appeal follows.[6]

II

"A declaratory judgment is a statutorily created remedy." *Martinez v. Scanlan*, 582 So. 2d 1167, 1170 (Fla. 1991) (citing ch. 86, Fla. Stat.). "The purpose of the declaratory judgment statute is to afford relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations[.]" *Id*. (citing § 86.101, Fla. Stat.). In order to prevail on a cause of action for a declaratory judgment, a plaintiff must prove "that he [or she] is in doubt as to the existence or non-existence

---

[6] We write to address why we affirm the trial court's entry of judgment in favor of Appellees against Appellants with respect to Appellants' cause of action for declaratory judgment and related request for injunctive relief. We affirm without further discussion the trial court's entry of judgment in favor of Appellees against Appellants with respect to Appellants' causes of action for ejectment and trespass.

of some right, status, immunity, power or privilege, [and] that he [or she] is entitled to have such doubt removed, and, if circumstances warrant it, obtain appropriate and necessary relief." *Rosenhouse v. 1950 Spring Term Grand Jury, in & for Dade Cnty.*, 56 So. 2d 445, 447 (Fla. 1952) (citations omitted); *see generally, e.g.*, §§ 86.011, .021, Fla. Stat.

"On review of a declaratory judgment, we defer to the trial court's factual findings if supported by competent, substantial evidence, but review conclusions of law de novo." *Harris v. Gilzean*, 397 So. 3d 134, 136 (Fla. 6th DCA 2024) (citation omitted); *e.g.*, *St. Vincent's Med. Ctr., Inc. v. Mem'l Healthcare Grp., Inc.*, 967 So. 2d 794, 799 (Fla. 2007) ("Under the familiar maxim, we review findings of fact under the competent substantial evidence standard, while legal conclusions are reviewed de novo." (citation omitted)). We review a trial court's ultimate decision of whether to grant a declaratory judgment action for an abuse of discretion. *See, e.g.*, *N. Shore Bank v. Town of Surfside*, 72 So. 2d 659, 661-62 (Fla. 1954) ("[T]he granting of relief in declaratory actions is discretionary in the trial courts. It is not a matter of right of a litigant."); *May v. Holley*, 59 So. 2d 636, 639 (Fla. 1952) (explaining that section 87.01—now codified at section 86.011—provides that trial courts "'may' render declaratory decrees" and that therefore "the entertainment of the [declaratory judgment] proceeding and the granting or withholding of relief

becomes a matter for the exercise of a sound judicial discretion in each case").[7] "A trial court only abuses its discretion if no reasonable person could adopt its view." *Fla. Ass'n of Realtors v. Orange County*, 350 So. 3d 115, 123 (Fla. 5th DCA 2022) (citing *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980)).

Although chapter 86 authorizes the seeking of injunctive relief in the same action as a declaratory judgment, it only authorizes the granting of injunctive relief after a declaratory judgment is obtained and only by motion:

> Declaratory relief, unknown to the ancient common law, is of legislative origin. *See Seaside Town Council, Inc. v. Seaside Cmty. Dev. Corp.*, 347 So. 3d 89, 100-01 (Fla. 1st DCA 2021) (Tanenbaum, J., dissenting) (briefly setting out history of Florida's declaratory judgment statute). Unlike a typical judgment rendered in favor of a plaintiff in a tort or contract suit, the declaratory judgment authorized by statute is distinct in that it "stands by itself; that is, no executory process follows as of course. In other words, such a judgment does not involve executory or coercive relief." *Watson v. Claughton*, 34 So. 2d 243, 245 (Fla. 1948) (quotations and citation omitted); *cf.* § 86.011, Fla. Stat. (authorizing a trial court "to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed" and providing that the "declaration may be either affirmative or negative in form and effect and such declaration has the force and effect of a final judgment"); *id.* ("Any person seeking a declaratory judgment may also demand additional, alternative, coercive, subsequent, or supplemental relief in the same action.").

> For this reason, chapter 86 requires a plaintiff to obtain declaratory relief first, before the plaintiff seeks an injunction. The

---

[7] In this case, the circuit court had jurisdiction to consider Appellants' cause of action for a declaratory judgment. *See generally May*, 59 So. 2d at 639 (establishing the "elements . . . necessary in order to maintain the status of [a declaratory judgment] proceeding as being judicial in nature and therefore within the constitutional powers of the courts").

injunctive relief is ancillary to and dependent upon the existence of a declaratory judgment, and, even then, the relief must be sought by motion. *See* § 86.061, Fla. Stat. (allowing "[f]urther relief based on a declaratory judgment [to] be granted when necessary or proper" and requiring "application therefor [to] be by motion to the court having jurisdiction to grant relief" once the parties' "rights have been adjudicated"); *cf. Fla. House of Representatives v. League of Women Voters of Fla.*, 118 So. 3d 198, 216 (Fla. 2013) (Canady, J., dissenting) ("Further relief is based on the prior declaratory judgment only if it seeks to give effect to that judgment—not if it seeks to wholly or partially invalidate that judgment."). If the trial court denies the declaratory relief on the merits, it is not authorized under chapter 86 to even reach the question of granting the supplemental relief because there is no judgment to serve as the condition precedent to filing the motion required by section 86.061.

*City of Newberry v. Alachua County*, 366 So. 3d 1176, 1178-79 (Fla. 1st DCA 2023) (emphasis omitted); *accord Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 339 So. 3d 1070, 1082 (Fla. 1st DCA 2022).

In the common law context, a request for injunctive relief implicates a trial court's equitable powers. *See, e.g.*, *Brevard County v. Obloy*, 301 So. 3d 1114, 1118 (Fla. 5th DCA 2020) ("[I]njunctions are equitable remedies that are to be sought and granted only when there is no adequate remedy available at law."); *see generally* 29 Fla. Jur. 2d Injunctions § 1 (2025) ("An injunction is a discretionary equitable remedy, primarily preventive in nature, which is designed to protect one from irreparable injury by commanding acts to be done or prohibiting their commission."

8

(citations and footnotes omitted)).[8] In general, a party seeking a mandatory injunction must establish that: (1) a clear legal right has been violated; (2) irreparable harm has been threatened; (3) no adequate remedy at law exists; and (4) the issuance of a mandatory injunction is in the public interest. *See, e.g.*, *Park Crossing Homeowners Ass'n, Inc. v. Suarez*, 415 So. 3d 676, 690 (Fla. 4th DCA 2025); *Legakis v. Loumpos*, 40 So. 3d 901, 903 (Fla. 2d DCA 2010); *Shaw v. Tampa Elec. Co.*, 949 So. 2d 1066, 1069 (Fla. 2d DCA 2007). "Courts distinguish between prohibitory injunctions, which restrain specific conduct, and mandatory injunctions, which command specific conduct and are looked upon with disfavor." *Park Crossing*, 415 So. 3d at 690; *see also E. Fed. Corp. v. State Off. Supply Co., Inc.*, 646 So. 2d 737, 741 (Fla. 1st DCA 1994). "The injunction's proponent must establish each element [of the four-part test for an injunction] with competent substantial evidence. If any element is missing, a trial court cannot enter an injunction." *See Fla. Ass'n of Realtors*, 350 So. 3d at 123 (citations omitted).

On review of a trial court's decision regarding injunctive relief, we defer to the trial court's factual findings if supported by competent, substantial evidence, but review conclusions of law de novo. *See, e.g.*, *Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1110 (Fla. 2021). We review a trial court's ultimate decision

---

[8] We are not presented in this case with a statutory cause of action for injunctive relief. *See, e.g.*, § 741.30, Fla. Stat.

regarding whether to grant injunctive relief for abuse of discretion. *See, e.g.*, *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 118 So. 2d 541, 544 (Fla. 1960) ("The appellant has failed completely to demonstrate a clear abuse of discretion by the [trial court]. He must do this if he is to justify our reversal of the order denying the injunction."); *Godwin v. Phifer*, 41 So. 597, 602 (Fla. 1906) ("[B]oth the granting and continuing of injunctions rest[] largely in the sound judicial discretion of the [trial] court, to be governed by the circumstances of the case.").

## III

Appellants raise several interrelated issues. Two are dispositive to this appeal.

## A

Appellants argue that the trial court's judgment should be reversed because, in Appellants' view, the trial court erred in refusing to equitably distribute the parties' riparian rights. Specifically, Appellants argue that the trial court was legally required by the Florida Supreme Court's decision in *Hayes* to equitably allocate the specific riparian areas within which the parties may exercise their respective riparian rights. We disagree.

Before addressing the relevant facts and holdings of *Hayes*, we generally explain what riparian rights are and how they intersect with the public trust doctrine that governs sovereign submerged lands in Florida.

Riparian rights are the rights of a landowner whose property borders "on a body of water or watercourse" such as a river or stream. *Black's Law Dictionary* 1591 (12th ed. 2024); *see also Black's Law Dictionary* 1327 (6th ed. 1990). Similarly, littoral rights are the rights of a landowner whose property borders "the coast or shore of an ocean, sea, or lake." *Black's Law Dictionary* 1118 (12th ed. 2024); *see also Black's Law Dictionary* 934 (6th ed. 1990). Although the rights at issue in this case are technically "littoral rights," we use the term "riparian rights" throughout this opinion as the terms are "generally considered interchangeable as to legal effect, and the context makes it clear which physical condition exists." *City of Parker v. Wilson*, 416 So. 3d 354, 356 n.1 (Fla. 1st DCA 2025); *see, e.g.*, *Bd. of Trs. of the Int. Imp. Tr. Fund v. Sand Key Assocs., Ltd.*, 512 So. 2d 934, 936 (Fla. 1987) ("The term 'riparian owner' applies to waterfront owners along a river or stream, and 'littoral owner' applies to waterfront owners abutting an ocean, sea, or lake. Cases and statutes, however, have used 'riparian owner' broadly to describe all waterfront owners."); § 253.141(1), Fla. Stat. ("Riparian rights are those incident to land bordering upon navigable waters. They are rights of ingress, egress, boating, bathing, and fishing and such others as may be or have been defined by law. Such rights are not of a proprietary nature. They are rights inuring to the owner of the riparian land but are not owned by him or her. They are appurtenant to and are inseparable from the riparian land. The land to which the owner holds title must

11

extend to the ordinary high watermark of the navigable water in order that riparian rights may attach.").

Private upland owners hold their riparian rights to "bathing, fishing, and navigation . . . in common with the public." *Walton County v. Stop Beach Renourishment, Inc.*, 998 So. 2d 1102, 1111 (Fla. 2008). In contrast, "upland owners hold several special or exclusive common law [riparian] rights: (1) the right to have access to the water; (2) the right to reasonably use the water; (3) the right to accretion and reliction; and (4) the right to the unobstructed view of the water." *Id.*; *see generally id.* at 1112 (explaining that the "[riparian] rights to access, use, and view are easements under Florida common law" whereas the "right to accretion and reliction is a contingent, future interest that only becomes a possessory interest if and when land is added to the upland by accretion or reliction").[9,10] "Though subject to regulation, these [riparian] rights are [constitutionally protected] private property rights[.]" *Id.* at 1111. Of course, these special riparian rights "may not be so exercised [by riparian-rights holders] as to injure others in their lawful rights," including other riparian-rights holders. *Id.* (quoting *Ferry Pass Inspectors' &*

---

[9] This case does not involve accretion or reliction.

[10] Throughout this opinion we often use the term "use" to generically refer to a private landowner using one or more of his or her riparian rights. However, we acknowledge that "the [riparian] right to reasonably use the water" is a distinct riparian right. *See Stop Beach Renourishment*, 998 So. 2d at 1111.

*Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n*, 48 So. 643, 645 (Fla. 1909)).

Relevant to this case, upland owners also hold a qualified "[riparian] right[]" to "wharf out to navigability." *Belvedere Dev. Corp. v. Dep't of Transp., Div. of Admin.*, 476 So. 2d 649, 651 (Fla. 1985) (first alteration in original) (approvingly quoting *Belvedere Dev. Corp. v. Div. of Admin., State Dep't of Transp.*, 413 So. 2d 847, 851 (Fla. 4th DCA 1982) (Hershey, J., concurring specially)); *see, e.g.*, *Freed v. Miami Beach Pier Corp.*, 112 So. 841, 844-45 (Fla. 1927) ("Riparian or littoral owners to ordinary high-water mark on the ocean or gulf or other navigable waters have, by the common law, a qualified right with the consent or acquiescence of the state to erect wharves or piers or docks in front of the riparian holdings to facilitate access to and the use of the navigable waters, subject to lawful state regulation and to the dominant powers of Congress. If such wharves or piers or docks are erected without due authority, they may be removed as purprestures, or, if they are or become nuisances or are harmful to the rights of the public, they may be removed or abated by due course of law." (citations omitted)); *Shore Vill. Prop. Owners' Ass'n, Inc. v. State Dep't of Envtl. Prot.*, 824 So. 2d 208, 211 (Fla. 4th DCA 2002) ("[R]iparian rights include the building of a dock to have access to navigable waters."). The riparian right to wharf out to navigability "is qualified not only by the necessity of obtaining a license from the State but by the predominant rights of the

13

public in navigable waters such that 'even when the title [to submerged lands] is in private parties a recovery of possession is subject to the rights of the public in the waters.'" *5F, LLC v. Dresing*, 142 So. 3d 936, 942 (Fla. 2d DCA 2014) (alteration in original) (quoting *Williams v. Guthrie*, 137 So. 682, 684-85 (Fla. 1931)).

Riparian rights do not exist in a vacuum; they are inextricably connected to the legal principles of sovereign submerged land and the public trust doctrine. "Upon the admission of Florida into the Union by Act of Congress of March 3, 1845, the state, by virtue of its sovereignty, became the owner of all lands under the navigable waters within the state[.]" *Martin v. Busch*, 112 So. 274, 283 (Fla. 1927) (citing *Pollard v. Hagan*, 44 U.S. 212 (1845)). "The navigable waters [generally] include [all navigable] lakes[.]" *Id.* (collecting cases); *see also* § 253.141(2), Fla. Stat. ("Navigable waters in this state shall not be held to extend to any permanent or transient waters in the form of so-called lakes, ponds, swamps or overflowed lands, lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the state without reservation of public rights in and to said waters."); *see generally Fla. Dep't of Transp. v. Lauderdale Boat Yard, LLC*, 336 So. 3d 28, 32 (Fla. 4th DCA 2022) ("To be considered sovereign submerged land, it must have been navigable when Florida joined the union."); *Bd. of Trs. of the Int. Imp. Tr. Fund v. Fla. Pub. Utils. Co.*, 599 So. 2d 1356, 1357-58 (Fla. 1st DCA 1992) (discussing "Florida's test for navigability," including several

14

Florida cases applying the test). Florida "took title to these [sovereign] submerged lands to hold in trust for the use and benefit of all the people of Florida." *Krieter v. Chiles*, 595 So. 2d 111, 111 (Fla. 3d DCA 1992). This is because at common law, pursuant to the public trust doctrine, "all navigable waters and lands under such waters were held by the sovereign for the benefit of the people." *BB Inlet Prop., LLC v. 920 N. Stanley Partners, LLC*, 293 So. 3d 538, 543 (Fla. 4th DCA 2020) (quoting *Graham v. Edwards*, 472 So. 2d 803, 806 (Fla. 3d DCA 1985)). Article X, section 11, Florida Constitution,

Having generally discussed riparian rights, sovereign submerged land, and the public trust doctrine, we now turn to *Hayes*. In *Hayes*, the Florida Supreme Court was presented with a dispute between two sets of landowners whose parcels of private property bordered a body of water with a Channel—i.e., the Boca Ciega Bay. *Hayes*, 91 So. 2d at 796-803. Then, as now, the term "channel" was understood to

depriving others of an equal opportunity to use. . . . A study of the cases discloses two fundamentally different theories or views on the question. One is the theory adopted by the English courts and some American jurisdictions which may be called the [n]atural [f]low or [n]atural [l]aw theory. The other, adopted by a number of American jurisdictions, is the [r]easonable [u]se theory."); Joseph W. Dellapenna, *The Evolution of Riparianism in the United States*, 95 Marq. L. Rev. 53, 57 (2011) ("[T]here was no settled law of water allocation in England until fairly late. The first English precedent that fully enunciated the doctrine of riparian rights did not come until 1833 and relied heavily on the already decided American cases. . . . [I]t seems too much to conclude that there was a developed or coherent theory of riparian rights brought over from England by the colonists." (citations omitted)); *Florida v. Georgia*, 585 U.S. 803, 816 (2018) (acknowledging the establishment of the principle of "reasonable use" (citing *Tyler v. Wilkinson*, 24 F. Cas. 472, 474 (C.C.D.R.I. 1827) (Story, J.))); *United States v. Willow River Power Co.*, 324 U.S. 499, 505 (1945) ("The fundamental principle of this system is that each riparian proprietor has an equal right to make a reasonable use of the waters of the stream, subject to the equal right of the other riparian proprietors likewise to make a reasonable use." (citation omitted)); *Tyler*, 24 F. Cas. at 474 ("There may be, and there must be allowed of that, which is common to all [riparian proprietors], a reasonable use [of the water]."). Irrespective of its origin, Florida's courts have adopted the reasonable-use rule, *see, e.g.*, *Vill. of Tequesta v. Jupiter Inlet Corp.*, 371 So. 2d 663, 666 (Fla. 1979); *Cason v. Fla. Power Co.*, 76 So. 535, 536 (Fla. 1917), and applied it to a number of contexts, including non-navigable, privately-owned lake bottoms, *see, e.g.*, *Duval v. Thomas*, 114 So. 2d 791 (Fla. 1959); *Taylor v. Tampa Coal Co.*, 46 So. 2d 392 (Fla. 1950); *Florio v. State ex rel. Epperson*, 119 So. 2d 305 (Fla. 2d DCA 1960). In circumstances not applicable to the facts of this case, the reasonable-use rule has been modified by statute. *See generally, e.g.*, *Sw. Fla. Water Mgmt. Dist. v. Charlotte County*, 774 So. 2d 903, 907, 912 (Fla. 2d DCA 2001).

mean "[t]he deeper part of a river, harbor, strait, etc." *Merriam-Webster's New Collegiate Dictionary* 139 (6th ed. 1949); *see Merriam-Webster's Collegiate Dictionary* 278 (12th ed. 2026) (defining "channel" in relevant part as "the deeper part of a river, harbor, or strait").

The appellees in *Hayes* had previously acquired a parcel of submerged land from the State. *Hayes*, 91 So. 2d at 798. After dredging and filling the land, the appellees built a subdivision, which included the parties' private properties located near one another at the edge nearest to the Channel of the Bay. *Id.* Lots A and B belonged to the appellees and lot 11, block 3, belonged to the appellants. *Id.* Thereafter, in 1954, the appellees acquired an additional strip of submerged land from the State extending from the edge of the appellees' private property and proposed to dredge and fill the newly acquired submerged land in the direction of the Channel of the Bay. *Id.* In response, the appellants filed a declaratory judgment action complaint seeking to enjoin the appellees' planned dredge-and-fill. *Id.* at 796, 798. The appellants contended that the appellees' dredge-and-fill, if allowed to proceed, would obstruct the appellants' common law riparian rights to an unobstructed view of the Bay, as well as a right of ingress and egress to and from their land over the waters of the Bay from and to the Channel. *Id.* at 798. The chancellor—i.e., the trial court—entered a summary final decree—i.e., a

20

judgment—in favor of the appellees, and the appellants filed an appeal seeking reversal of the decree. *Id.*

On appeal, the *Hayes* court considered whether the appellees' proposed dredge-and-fill, if constructed, would encroach upon the appellants' common law riparian rights. *Id.* at 796. Its analysis proceeded in three parts.

First, the court displayed a drawing of the proposed dredge-and-fill and discussed the factual and procedural history of the case, some of which we have discussed above. *Id.* at 797-98.

Next, the *Hayes* court "summarize[d] the development of state ownership of submerged tidal lands, the power of disposition thereof and the co-relative riparian rights of upland owners." *Id.* at 800. The *Hayes* court covered much ground in this section. *See id.* at 798-800. We merely attempt a brief summary. The *Hayes* court explained that riparian rights "are appurtenances to private property which are entitled to due recognition and protection." *Id.* at 799. It further explained that "[s]ubject to certain statutory variations . . . , it is well settled in Florida that the State holds title to lands under tidal navigable waters and the foreshore thereof (land between high and low water marks)" and that "[a]s at common law, this title is held in trust for the people for purposes of navigation, fishing, bathing and similar uses." *Id.* Although "the State may dispose of submerged lands under tidal waters" consistent with the common law, it may only do so "to the extent that such

21

disposition will not interfere with the public's right of navigation, swimming and like uses." *Id.* Likewise, "any person acquiring any such lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water)." *Id.* The court went on to explain that "[u]pland owners have been granted additional statutory riparian rights which must be recognized." *Id.* at 799-800. The court then discussed chapters 253 and 271, Florida Statutes. *Id.* at 800. Relevant here, the court discussed several components of chapter 271. *Id.* The court explained chapter 271 showed that "[t]he riparian rights of upland owners of lands bounded by tidal waters in Florida have been expanded by statute," including "the [provisional] right of an upland owner to dredge, bulkhead and fill in front of his land to the edge of the channel." *Id.* (citing ch. 271, Fla. Stat. (1921); ch. 8537, Laws of Fla. (1921)). The court also explained chapter 271 showed that "[t]he so-called common law riparian rights of upland owners bordering upon navigable waters have now been expressly recognized by statute." *Id.* (citing § 271.09, Fla. Stat. (1953); ch. 28262, Laws of Fla. (1953)).[13]

---

[13] Although the *Hayes* court initially referenced the 1921 version of chapter 271, it later referenced and relied upon the 1953 version of chapter 271, as amended by chapter 28262, Laws of Florida. *See generally Hayes*, 91 So. 2d at 800. Chapter 28262, Laws of Florida, amended the 1953 version of chapter 271 to add section 271.09 to the already existing sections 271.01-.08. *Compare* §§ 271.01-.08, Fla. Stat. (1953), *with* ch. 28262, Laws of Fla. (1953). Today, chapter 271 no longer exists, but some portions of it still exist in some form or fashion in chapter 253, Florida

Lastly, the *Hayes* court "appl[ied] these [foregoing] rules to the case before [it]." *Id.* The *Hayes* court covered much ground in this section too. Instead of summarizing, we directly quote the following relevant portions. In doing so, we note the prominence of section 271.01—and its limited equitable distribution language pertaining to an upland owner's privilege to bulkhead in the direction of a channel— to the *Hayes* court's analysis of the issue of whether the appellees' proposed dredge- and-fill in the direction of the Channel of the Bay, if constructed, would encroach upon the appellants' common law riparian rights:

> We harken back to the main points made by the parties. Appellants claim that they are entitled to an unobstructed view toward the Channel over a corridor measured by extending their northeasterly- southwesterly lot lines directly to the Channel. Appellees claim that this corridor is to be bounded by imaginary lines drawn at right angles from the thread of the Channel to the corners of appellants' lot. If appellants' contention is approved, the proposed fill would obstruct their view. If appellees' position is adopted, there would be no obstruction.

> It is absolutely impossible to formulate a mathematical or geometrical rule that can be applied to all situations of this nature. The angles (direction) of side lines of lots bordering navigable waters are limited only by the number of points on a compass rose. Seldom, if ever, is the thread of a channel exactly or even approximately parallel to the shoreline of the mainland. These two conditions make the mathematical or geometrical certainly implicit in the rules recommended by the contesting parties literally impossible. We must therefore search elsewhere for a solution to this admittedly difficult problem. We find our answer at least suggested by the language of Section 271.01, Florida Statutes, F.S.A. granting bulkheading privileges to upland owners 'in the direction of the channel, or as near

Statutes. Chapter 253 is the current statute that generally governs state lands. *See generally* ch. 253, Fla. Stat. (2025).

23

in the direction of the channel as practicable to equitably distribute the submerged lands * * *.' Added legislative support for this notion is contributed by the fact that Section 271.09, Florida Statutes, F.S.A., does not purport to define or delineate the exact area over which the so-called common law riparian rights are to be enjoyed.

We are therefore of the view and must hold that the common law riparian rights to an unobstructed view and access to the Channel over the foreshore across the waters toward the Channel must be recognized over an area as near 'as practicable' in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. This rule means that each case necessarily must turn on the factual circumstances there presented and no geometric theorem can be formulated to govern all cases. An upland owner must in all cases be permitted a direct, unobstructed view of the Channel and as well a direct, unobstructed means of ingress and egress over the foreshore and tidal waters to the Channel. If the exercise of these rights is prevented, the upland owner is entitled to relief.

In the instant case the Chancellor obviously held that the appellees had not encroached upon or threatened to encroach upon appellants' right of view or right of approach to the Channel of Boca Ciega Bay. We agree with the Chancellor. The appellants still have a direct, unobstructed [view of the] Channel as well as a direct and unobstructed means of ingress and egress to the Channel of the Bay.

. . . .

In Freed v. Miami Beach Pier Corporation, supra, the late Justice Whitfield, who many times wrote the view of this Court on the subject at hand, pointed out that the shore line and the channel may not run in the same direction and the boundary lines of lands that extend to the shore line may not run at right angles with the shore line. He then added that these conditions tender questions as to rights of riparian owners that require the application of appropriate rules to particular facts in each case as it is presented for adjudication.

Riparian rights do not necessarily extend into the waters according to upland boundaries nor do such rights under all conditions extend at right angles to the shore line. Our own precedents are

completely inconsistent with the appellees' view that such rights extend over an area measured by lines at right angles to the Channel. It should be borne in mind that littoral or riparian rights are appurtenances to ownership of the uplands. They are not founded on ownership of the submerged lands. It is for this reason, among others that we cannot define the area within which the rights are to be enjoyed with mathematical exactitude or by a metes and bounds description.

We therefore prescribe the rule that in any given case the riparian rights of an upland owner must be preserved over an area 'as near as practicable' in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. In making such 'equitable distribution' the Court necessarily must give due consideration to the lay of the upland shore line, the direction of the Channel and the co-relative rights of adjoining upland owners.

*Id.* at 801-02.

Ultimately, the *Hayes* court upheld the trial court's final judgment in favor of the appellees because the appellants "still may enjoy their riparian rights over the waters of Boca Ciega Bay in an area as 'near as practicable' in the direction of the Channel with a resulting equitable distribution of the submerged lands and the waters and area above said lands between their upland and the edge of the Channel." *Id.* at 802. The court cautioned that its holding regarding the appellants' riparian rights was limited to "the effect of the proposed filling of the particular submerged land adjacent to appellees' lots," noting that if the circumstances should change and "[i]f the fill should be extended in a southerly direction so as to interrupt appellants' remaining view of or approach to the Channel, appellants might then have substantial grounds for complaint." *Id.*

So what is the takeaway from *Hayes* in reference to the present appeal? True, the *Hayes* court created an "equitable distribution" test involving several factors, including "the lay of the upland shore line, the direction of the Channel and the co-relative rights of adjoining upland owners." *Id.*

But unlike the parties, we do not believe that the *Hayes* test for equitable distribution—which certainly constituted a holding as applied to the facts presented in *Hayes*—applies to the facts of this case. *See, e.g.*, *Miccosukee Tribe of Indians v. Lewis Tein, P.L.*, 227 So. 3d 656, 661 (Fla. 3d DCA 2017) ("One of the basic principles of appellate law is that the holding of a decision cannot extend beyond the facts of the case." (collecting cases)); *Cusick ex rel. Cusick v. City of Neptune Beach*, 765 So. 2d 175, 177 (Fla. 1st DCA 2000) ("[T]he doctrine of stare decisis applies a rule of law established in an earlier case only to a later case that involves a factual situation similar to that in the former." (citing *Forman v. Fla. Land Holding Corp.*, 102 So. 2d 596, 598 (Fla. 1958)); *cf. Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." (citation omitted)). We read *Hayes* as only requiring the equitable distribution test to be applied in cases involving the statutory "granting [of] bulkheading privileges to upland owners 'in the direction of the channel, or as near in the direction of the channel as practicable to equitably

26

distribute the submerged lands'" or another analogous statute. *Hayes*, 91 So. 2d at 801 (quoting section 271.01, Fla. Stat.); *cf. Dresing*, 142 So. 3d at 942, 946 ("*Hayes* involved the interplay of riparian rights and the rights of the owners of privately held submerged lands. . . . *Hayes* presented a set of facts which [is] increasingly rare—the applicability of riparian rights where submerged land under navigable water has been or will be dredged and filled to create upland."). The "equitable distribution" language in *Hayes* came directly from section 271.01, which at the time stated in relevant part that:

> the grant [of submerged lands] herein made shall apply to and affect only those submerged lands which have been, or may be hereafter, actually bulkheaded, filled in, or permanently improved, continuously, from high water mark in the direction of the channel, or as near in the direction of the channel as practicable to *equitably distribute* the submerged lands, and shall in no wise affect such submerged lands until actually filled in or permanently improved.

§ 271.01, Fla. Stat. (1953) (emphasis added); *see Hayes*, 91 So. 2d at 801 (quoting section 271.01, Fla. Stat. (1953)). The *Hayes* court cited no other authority requiring the equitable distribution of sovereign submerged land. Although section 271.01 no longer exists, a similar version of the statutes exists today in section 253.12(5)(b). *See generally* § 253.12(5)(b), Fla. Stat. (2025) ("For the purposes of this subsection, 'riparian upland owners' shall be defined as those persons owning upland property abutting those portions of the waters to be filled or drained, which are within 1,000 feet outboard of said riparian upland, but not more than one-half the distance to the

27

opposite upland, if any, and within the extensions of the side boundary lines thereof, when said side boundary lines are extended in the direction of the channel along an alignment which would be required to distribute equitably the submerged land between the upland and the channel."). Here, we are not presented with a case involving the circumstances described in section 253.12(5)(b), so we need not decide whether the *Hayes* equitable distribution test would apply to such a case.

To be clear, we hold that the *Hayes* equitable distribution test does not apply to facts presented in this case—namely, a case involving a riparian-rights-related dispute between two sets of adjacent landowners with riparian rights to use a lake comprised of sovereign submerged land but where neither party seeks to fill or drain sovereign submerged land underlying the lake and where no statute has been shown to grant either party a right to an equitable distribution of the lake's sovereign submerged land beyond the boundary of their respective private properties.

So what test applies to guide the trial court's exercise of discretion in determining whether Appellants are entitled to a declaratory judgment and mandatory injunctive relief requiring Appellees to modify their dock/boathouse? We find the answer to the question in how the Florida Supreme Court and other Florida courts have treated disputes between riparian proprietors over privately-owned lake bottoms. *See, e.g.*, *Duval v. Thomas*, 114 So. 2d 791 (Fla. 1959); *Taylor v. Tampa Coal Co.*, 46 So. 2d 392 (Fla. 1950); *Florio v. State ex rel. Epperson*, 119

28

So. 2d 305 (Fla. 2d DCA 1960). For example, in *Duval*—issued just two years after

*Hayes*—the Florida Supreme Court held that "all similarly situated owners [of

property with certain of its boundaries under the water of a lake] may use all of the

lake for boating, bathing and fishing so long as none interferes with the rights of the

others," that "the body of water should be available to all owners for use that would

not *unreasonably interfere* with rights of the other [riparian] proprietors," and that

"[i]f the use by any owner amounts to transgression of the rights of his neighbors,

the violation can be remedied by recourse in the courts." *Duval*, 114 So. 2d at 793-

94 (emphasis added).[14] Florida's appellate courts have since applied the same rule.

---

[14] Notably, *Duval* did not cite *Hayes* in crafting the "unreasonable interference" test applicable to disputes between riparian proprietors over privately-owned lake bottoms. *See generally Duval*, 114 So. 2d at 791-95. This lends further support for the conclusion that *Hayes*' "equitable distribution" test and its "each case," "all cases," "any given case," and "distribute equitably" language is limited to the factual and statutory circumstances presented in *Hayes*. *See generally Hayes*, 91 So. 2d at 801-02 ("We are therefore of the view and must hold that the common law riparian rights to an unobstructed view and access to the Channel over the foreshore across the waters toward the Channel must be recognized over an area as near 'as practicable' in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. This rule means that each case necessarily must turn on the factual circumstances there presented and no geometric theorem can be formulated to govern all cases. An upland owner must in all cases be permitted a direct, unobstructed view of the Channel and as well a direct, unobstructed means of ingress and egress over the foreshore and tidal waters to the Channel. If the exercise of these rights is prevented, the upland owner is entitled to relief. . . . We therefore prescribe the rule that in any given case the riparian rights of an upland owner must be preserved over an area 'as near as practicable' in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. In making such 'equitable distribution' the Court necessarily must give due consideration to the lay of the upland shore line, the

29

*See, e.g.*, *Florio*, 119 So. 2d at 310 ("The rights of riparian proprietors to the use of waters in a non-navigable lake are equal, and each riparian owner has the right to use the water in the lake for lawful purposes, so long as his use is not detrimental to the rights of the other riparian owners. Except as to the supplying of natural wants, including the use of water for domestic purposes, it is immaterial what use is made if that use is lawful and reasonable. The use of lands which border on waters of a non-navigable lake for purposes of pleasure, recreation, and health is a use which requires a remedy on behalf of a riparian owner where there is unreasonable interference. One riparian owner is not entitled to use the lake to the exclusion of other riparian owners. Each owner of riparian rights is entitled to the reasonable use of the lake, and where an owner's lawful use is unreasonably interfered with, that owner is entitled to injunctive relief." (citations omitted)); *Conrad v. Whitney*, 141 So. 2d 796, 798 (Fla. 2d DCA 1962) (citing *Florio*, 119 So. 2d at 310). *Duval* was consistent with prior Florida Supreme Court precedent. In *Taylor*, the Florida Supreme Court similarly held:

---

direction of the Channel and the co-relative rights of adjoining upland owners."). Otherwise, absent distinguishing, modifying, or receding from *Hayes*, the *Duval* court would have presumably been constrained to apply *Hayes* and its equitable distribution test to the facts of *Duval*. *Cf. Stevens v. State*, 226 So. 3d 787, 792 (Fla. 2017) (reiterating that the Florida Supreme Court "does not intentionally overrule itself sub silentio" (citation omitted)). But the *Duval* court was not constrained by *Hayes*, as the holding of *Hayes* regarding the equitable distribution test was limited by the facts of *Hayes*. *See, e.g.*, *Miccosukee Tribe*, 227 So. 3d at 661; *Cusick*, 765 So. 2d at 177; *cf. Pedroza*, 291 So. 3d at 547.

It is the rule the rights of riparian proprietors to the use of waters in a non-navigable lake such as the one here involved are equal. . . . [E]ach riparian owner has the right to use the water in the lake for all lawful purposes, so long as his use of the water is not detrimental to the rights of other riparian owners.

*Taylor*, 46 So. 2d at 394. The common thread between cases like *Duval*, *Taylor*, and *Florio* is that the test for disputes between riparian proprietors over privately-owned lake bottoms is whether one riparian owner's use unreasonably interferes with another riparian owner's use. We see no principled justification for applying one test to disputes over riparian rights to privately-owned lake bottoms and another test to disputes over riparian rights to publicly-owned lake bottoms.[15]

---

[15] Appellants dispute the applicability of *Duval* and other cases involving privately-owned lake bottoms to the facts of this case—i.e., a lake involving a publicly-owned lake bottom—on the view that only publicly-owned bodies of water can be navigable, and that because privately-owned lakes may be non-navigable, they do not necessarily implicate riparian rights. *See generally* § 253.141(1)-(2), Fla. Stat. Indeed, *Duval*, *Taylor*, and *Florio* each referred to the lakes at issue in those cases as both privately owned and non-navigable. *See generally Duval*, 114 So. 2d at 792; *Taylor*, 46 So. 2d at 392; *Florio*, 119 So. 2d at 310. We thus acknowledge that *Duval*, *Taylor*, and *Florio* involved riparian rights in the general sense of riparian rights of use incident to land bordering bodies of water—be they public or private, navigable or non-navigable—rather than in the specific sense of riparian rights of use incident to land bordering public, navigable bodies of water. *Compare, e.g.*, § 253.141(1), Fla. Stat. (specifically defining "[r]iparian rights" as "those incident to land bordering upon navigable waters"), *with, e.g.*, *Black's Law Dictionary* 1591 (12th ed. 2024) (generally defining "riparian right[s]" as "[t]he right[s] of [use of] a landowner whose property borders on a body of water" without mentioning the terms public, private, navigable, or non-navigable), *and Taylor*, 46 So. 2d at 394 (generally referring to the rights of "riparian proprietors" and "riparian owners"), *and Florio*, 119 So. 2d at 310 (generally referring to the rights of "riparian proprietors" and "riparian owners"); *see generally, e.g.*, Restatement (Second) of Torts § 843 (Am. L. Inst. 1979) ("Land is riparian when it is so located in relation to

31

We are aware of no common-law rule, and the parties have cited none to us, requiring—either in all cases involving riparian-rights-related disputes generally or in those cases involving riparian-rights-related disputes over navigable, publicly-owned land specifically—a metes-and-bounds equitable distribution of such land and the waters overlaying it vis-à-vis two private riparian owners. *See generally, e.g.*, *Duval*, 114 So. 2d at 793 ("We are not advised, and our own research has not divulged the clear, unambiguous pronouncement of the common law in effect 4 July 1776, that would leave us no room but to adopt it in this case under the mandate of [section 2.01, Florida Statutes]. . . . [W]e have not found cases from the English courts, and have been cited none, fixing the relative rights of owners of the bed of a

---

a [body of water] that its possessor enjoys the natural advantages and benefits of the water and has the opportunity to withdraw the water. Riparian land may include all or part of the bed or may only border upon the water if the bed is owned by another person or the public. In these cases the separate ownership may affect the exercise of some riparian rights by the owner of the adjoining upland but it does not affect the essential riparian quality of his land."). Regardless, as just explained, we can conceive of no principled justification for applying one test to resolve a dispute over rights to use non-navigable, privately-owned lake bottoms and a completely different test to resolve disputes over rights to use navigable, publicly-owned lake bottoms. The reason is simple: the rights of adjacent upland landowners to *use* the water overlaying and land underlying a lake remain co-relative to one another's rights of use irrespective of who *owns* the land underlying the lake. It thus matters not whether *Duval*, *Taylor*, and *Florio* are viewed generally as riparian-rights-to-use-a-lake cases or specifically as rights-to-use-a-lake-of-a-non-riparian-nature cases.

lake of the nature of [a non-navigable, privately-owned lake].").[16] Cases like *Duval*—issued by the Florida Supreme Court just two years after *Hayes*—as well as *Taylor* and *Florio* support our conclusion that the *Hayes* equitable distribution test did not create a one-size-fits-all test for adjudicating cases involving riparian-rights-related disputes generally or cases involving riparian-rights-related disputes over navigable, publicly-owned land specifically. To be sure, had the *Duval* court thought *Hayes* was one-size-fits-all, it would have presumably applied it to the facts of *Duval*, but it did not. And as just explained, a fair reading of *Hayes* shows that its equitable distribution test was premised on a distinct factual scenario and a statute inapplicable to this case.

We are also persuaded by the reasoning of the Florida Supreme Court in *Duval*—rendered in the analogous context of a non-navigable, privately-owned lake—that "the application of a rule" requiring metes-and-bounds line drawing to resolve riparian-rights-related disputes, in the absence of a common law rule or a statutory requirement, would present an "unpleasant and impractical state of affairs." *Duval*, 114 So. 2d at 795; *see id.* ("We think the situation of Thomas [whose use of

---

[16] *See generally, e.g.*, T. E. Lauer, *The Common Law Background of the Riparian Doctrine*, 28 Mo. L. Rev. 60, 80-107 (1963) (surveying the development of the common law doctrine of water rights as expressed in the written reports of English water decisions from 1580 to 1825); Dellapenna, *The Evolution of Riparianism in the United States*, *supra*, at 55-64 (discussing the origin of riparian rights).

a lake was restricted to a small wedge-shaped area] is a classic example of the unpleasant and impractical state of affairs that would result from the application of a rule that each owner could erect a barricade on his boundary line, though it was of the kind, such as a fence, that would not disturb the waters in place, but would prevent adjacent owners from enjoying the ordinary pleasures of the lake. . . . If the enjoyment of non-navigable lakes were to be curtailed or restricted by a holding that the owner of a portion of one of them, and his guests, should enjoy the waters only within the property lines the damage would be immeasurable." (citations omitted)). Although Appellants in this case are not seeking authorization to build a physical fence to separate what they believe to be the parties' respective riparian rights of use of a navigable, publicly-owned lake—i.e., the parties' respective, co-relative rights to access and view and use and wharf out to navigability over sovereign submerged lands beyond the boundaries of their adjacent private properties—the metes-and-bounds line drawing sought by Appellants would have the same practical effect and purpose of the rule rejected in *Duval*. We thus see no reason why *Duval*'s reasoning should not be applied to the parties' riparian-rights-related dispute regarding the navigable, publicly-owned lake at issue in this case.

Therefore, based on our review of relevant Florida jurisprudence, we hold that the applicable test in this case is whether one riparian rights holder's use of the lake—i.e., Appellees' qualified riparian right to facilitate their access to and use of

the lake via their dock/boathouse—

held that "

riparian rights. The trial court was correct to apply the unreasonable interference test.[18]

Appellants emphasize that they have constitutionally protected property interests in their lake-related riparian rights. That is true, and Appellants' constitutionally protected property interests are important. But Appellants' arguments fail to distinguish between their constitutionally protected rights in their privately owned property comprised of non-submerged land—where Appellants have a per se right to both use and exclude—and their constitutionally protected rights in state-owned sovereign submerged land held in trust by the State pursuant to the public trust doctrine—where Appellants have a right to use but not necessarily to exclude. *See generally, e.g.*,

a riparian-rights holder may obtain a declaratory judgment and injunctive relief

No abuse of discretion has been shown on this record. In this case, the trial court entered

seeking supplemental injunctive relief in light of the trial court's denial of a declaratory judgment. *See City of Newberry*, 366 So. 3d at 1178-79. In any event, because Appellees' dock/boathouse does not unreasonably interfere with Appellants' riparian rights, Appellants would have still failed to meet their burden to establish irreparable harm or a clear legal right to a mandatory injunction—the first two hurdles of the four-part test for mandatory injunctive relief. *See, e.g.*, *Park Crossing*, 415 So. 3d at 690; *Legakis*, 40 So. 3d at 903; *Shaw*, 949 So. 2d at 1069. And given the facts of the case, we cannot say that no reasonable person in the trial court's position would have declined to grant mandatory injunctive relief to Appellants. *See Fla. Ass'n of Realtors*, 350 So. 3d 115 at 123.

Appellants argue they have a right to an unobstructed access to and view of the lake adjacent to their private property. But we reject Appellants' framing of the issue. Appellants have a right to a *reasonably* unobstructed access to and view of the lake—not a completely unobstructed access to and view of the lake. *See, e.g.*, *Duval*, 114 So. 2d at 793-94; *Taylor*, 46 So. 2d at 394; *Florio*, 119 So. 2d at 310; *see also Freed*, 112 So. at 844-45 ("Where, under proper authority, structures or objects are put upon lands below high-water mark of the ocean or gulf or other navigable waters, the rights of adjoining riparian owners and other persons, as well as the rights of the

decline to award the mandatory injunctive relief sought based on the balancing of the equities."

41

public, must be observed in exercising the duly acquired privilege to so use the land below high-water mark, and any *substantial encroachment* upon the rights of others may be remedied by timely and appropriate procedure in due course of law at the instance of proper parties . . . ." (emphasis added)); *cf. Lee County v. Kiesel*, 705 So. 2d 1013, 1015-16 (Fla. 2d DCA 1998) ("[T]o constitute a compensable obstruction of the riparian right of view, the interference must be more than a mere annoyance. It must *substantially and materially obstruct* the [riparian-rights holder's] view to the [applicable body of water]." (emphasis added)).

IV

Appellants' lake-related riparian rights are important. But under the facts of this case, Appellants' riparian rights are not exclusive; Appellees also have riparian rights in the same lake. The trial court's reasoned judgment appropriately declined to equitably draw a metes-and-bounds line demarcating specific areas where Appellants' and Appellees' riparian rights exist. The parties' riparian rights do not implicate any statute that grants Appellants a right to an equitable distribution of the lake's sovereign submerged land beyond the boundary of Appellants' private property. The parties' riparian rights are thus governed by the unreasonable interference test in the usage of their respective riparian rights to the publicly-owned lake. No abuse of discretion has been shown on this record as the trial court applied

42

the correct legal test and competent substantial evidence supports the trial court's findings. Accordingly, we affirm the trial court's amended final judgment.

The Florida Supreme Court's decision in *Hayes v. Bowman*, 91 So. 2d 795 (Fla. 1957), is also important. However, it was misread and misapplied by the Second District in *Brown v. Thomas*, 419 So. 3d 711 (Fla. 2d DCA 2025). We therefore certify this decision to be in direct conflict with *Brown*. *See* art. V, § 3(b)(4), Fla. Const.

AFFIRMED. CONFLICT CERTIFIED.

STARGEL and MIZE, JJ., concur.

Ronald D. Edwards, Jr., of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., and Michael M. Brownlee and Grace M. Zogaib, of The Brownlee Law Firm, P.A. Orlando, for Appellants.

Kimberly A. Ashby, of Kirwin Norris, P.A., Winter Park, for Appellees.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF TIMELY FILED